**FILED**
**United States Court of Appeals**
**Tenth Circuit**

**September 12, 2008**

**Elisabeth A. Shumaker**
**Clerk of Court**

<u>**PUBLISH**</u>

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

---

PAUL F. WEINBAUM; MARTIN J. BOYD,

      Plaintiffs – Appellants,

v.

THE CITY OF LAS CRUCES, NEW MEXICO; WILLIAM MATTIACE, individually, and in his official capacity as Mayor of the City of Las Cruces; DOLORES ARCHULETA, individually, and in her capacity as a member of the City Council of the City of Las Cruces; DOLORES CONNOR, individually, and in her capacity as a member of the City Council of the City of Las Cruces; JOSE FRIETZE, individually, and in his capacity as a member of the City Council of the City of Las Cruces; KENNETH MIYAGASHIMA, individually, and in his capacity as a member of the City Council of the City of Las Cruces; WESLEY STRAIN, individually, and in his capacity as a member of the City Council of the City of Las Cruces; STEVE TROWBRIDGE, individually, and in his capacity as a member of the City Council of the City of Las Cruces,

      Defendants – Appellees.

No. 06-2355

Foundation for Moral Law; National
Legal Foundation,

Amici Curiae.

_____

PAUL F. WEINBAUM,

      Plaintiff – Appellant,
v.

LAS CRUCES PUBLIC SCHOOLS;
CHARLES DAVIS; LEONEL
BRISENO, GENE GANT, JOHN
SCHWEBKE, and SHARON
WOODEN, as School Board Members
of Las Cruces Public Schools,

      Defendants – Appellees.

No. 07-2012

**Appeal from the United States District Court
for the District of New Mexico
(D.C. Nos. 2:CIV-05-996-RB/LAM and 2:CIV-03-1043-RB/LAM)**

Brett Duke, The Law Offices of Brett Duke, P.C., El Paso, TX, for Plaintiffs-Appellants.

Matthew P. Holt, Holt, Babington, Mynatt P.C., Las Cruces, NM, for Defendants-Appellees.

Roy S. Moore, Gregory M. Jones and Benjamin Dupre, Foundation for Moral Law, Montgomery, AL, filed an amicus curiae brief for Foundation for Moral Law.

Steven W. Fitschen, Virginia Beach, VA, filed an amicus curiae brief for the National Legal Foundation.

Paul F. Weinbaum, pro se, Las Cruces, NM.



Before **LUCERO, EBEL** and **HOLMES**, Circuit Judges.

**EBEL**, Circuit Judge.

Paul Weinbaum, a resident of the Las Cruces area, brought two separate suits under 42 U.S.C. § 1983 claiming that Las Cruces, New Mexico (the "City") and the Las Cruces Public School District (the "District") have violated the Establishment Clause of the First Amendment by displaying, in various forms, three crosses on public property.[1]  Weinbaum sought declaratory and injunctive relief in both suits, as well as damages and attorney's fees.

The district court evaluated Weinbaum's claims using the three-part test set forth in Lemon v. Kurtzman, 403 U.S. 602, 612-13 (1971), as slightly recast by subsequent Establishment Clause jurisprudence.  See Weinbaum v. City of Las Cruces ("Las Cruces"), 465 F. Supp. 2d 1164 (D.N.M. 2006); Weinbaum v. Las Cruces Public Schools ("LCPS I"), 465 F. Supp. 2d 1116 (D.N.M. 2006) (granting in part and denying in part District's summary judgment motion); Weinbaum v.

---

[1]Martin J. Boyd, also a resident of Las Cruces, joined Weinbaum as a plaintiff in the suit against the City.  We will refer to Weinbaum and Boyd as "Plaintiffs-Appellants."  We have consolidated, for ease of disposition, Appeal No. 06-2355, which was orally argued, and Appeal No. 07-2012, which was submitted on the briefs.

<u>Las Cruces Public Schools</u> ("<u>LCPS II</u>"), 465 F. Supp. 2d 1182 (D.N.M. 2006) (entering judgment for District, after trial, on Weinbaum's remaining claims).  The court reasoned that the unique history of the City's name and the absence of any evidence that (1) the City or District had a religious motive in adopting and displaying the symbols or (2) the symbols had the effect of endorsing religion dispelled any constitutional concerns.  Accordingly, the court entered judgment for the City in the litigation underlying Appeal No. 06-2355 and for the District in the litigation underlying Appeal No. 07-2012.  Plaintiffs-Appellants appealed.

In Appeal No. 06-2355, Weinbaum and Boyd argue that the district court erred because the City's symbol has the effect of endorsing Christianity.  In Appeal No. 07-2012, Weinbaum asserts that the purpose and effect of the District's display of three crosses on its maintenance vehicles and in two pieces of District-sponsored artwork is to endorse Christianity; he also takes issue with the District's written policy regulating religion in the District's schools.

In support of their position, Plaintiffs-Appellants note that this court has, in the past, held unconstitutional city and county seals that included crosses.  We did not, however, issue a <u>per se</u> rule in those cases.  These two Las Cruces cases illustrate the folly of doing so.  On the whole, Establishment Clause cases are predominantly fact-driven, and these cases are particularly <u>sui generis</u>.  Here, the City's name translates as "The Crosses" and, perhaps unsurprisingly, the City has opted to identify itself using a symbol that includes crosses.  Derivatively, the

- 4 -

District uses a symbol including crosses to identify its maintenance vehicles and also displays on District property two pieces of artwork that contain crosses.  We recognize that a government's display of the Latin or Christian cross, and especially three such crosses, raises legitimate Establishment Clause concerns.  Nevertheless, we affirm the district court's decisions because Las Cruces's unique name and history and the record in this case adequately establish according to requisite standards that the City and District's challenged symbols were not intended to endorse Christianity and do not have the effect of doing so.

I.     **Background**

   **A. The Cross**

   The Christian or Latin cross – a cross with three equal arms and a longer foot – reminds Christians of Christ's sacrifice for His people.  See Las Cruces, 465 F. Supp. 2d at 1170; see also 11 ENCYCLOPEDIA OF RELIGION 7640 (Lindsay Jones, ed., 2005); id. at 7688.  Accordingly, it is unequivocally a symbol of the Christian faith.[2]  In the gospels of Matthew, Mark, and Luke, the Romans crucified two criminals on crosses flanking Jesus's.  MATTHEW 27:38; MARK 15:27; LUKE 23:32-33.  Hence, as the district court explained, the symbol of three crosses, with the middle cross raised above the accompanying crosses, often represents the crucifixion of Jesus at Calvary.  See Las Cruces, 465 F. Supp. 2d at 1170-71.

---

   [2]But not exclusively so; the cross is an oft-used symbol in other cultures and religions as well.  See 5 ENCYCLOPEDIA OF RELIGION at 3434; 14 ENCYCLOPEDIA OF RELIGION at 9339 (discussing cross as symbol of tree of life).

The district court also briefly summarized the cross's occasionally checkered history as a symbol; that is, the cross's transformation–in the eyes of many–from a symbol of Christ's love to a symbol of Christian conquest.  See id. Because of this legacy, the cross, while humbling, inspiring, or empowering to some, intimidates, inflames, or unnerves others.

**B. The Parties**

The Plaintiffs-Appellants in Appeal No. 06-2355, Paul Weinbaum and Martin Boyd, are residents of the City.[3]  Both allege that they are "constantly forced to view the Las Cruces symbol."  They also aver that, because they are not Christian, the symbol offends, intimidates, and alienates them.

Defendants-Appellees in Appeal No. 06-2355 include the City, the individuals who compose the City's governing body (the City Council of Las Cruces), and the City's Mayor.  The City is about 225 miles nearly due south of Albuquerque, New Mexico.  Las Cruces was founded in 1849, incorporated as a town in 1907, and then reincorporated as a city in 1946.  The City is now New Mexico's second largest.

---

[3]Olivia Weinbaum, Paul Weinbaum's unemancipated minor daughter, originally joined the two other plaintiffs.  However, the district court dismissed her claims without prejudice because she did not make allegations sufficient to confer standing and, as an unemancipated minor, "she lacks the legal capacity to sue on her own behalf."  See Las Cruces, 465 F. Supp. 2d at 1165 n.1.  Plaintiffs-Appellants did not appeal this decision.

In the companion case, Appeal No. 07-2012, Weinbaum again appears as the plaintiff-appellant, although in this second appeal he proceeds pro se.[4] Weinbaum resides within the District and his daughter, Olivia, is enrolled in a District school. See Las Cruces, 465 F. Supp. 2d at 1165 n.1; LCPS II, 465 F. Supp. 2d at 1186. The District "is a governmental entity created by statute and governed by an elected School Board." LCPS II, 465 F. Supp. 2d at 1186. It is New Mexico's second largest school district. Id. Weinbaum also sued individual members of the District's School Board in their official capacities. Id.

**C. Origin of the Name "Las Cruces"[5]**

By 1598, *El Camino Real de Tierra Adentro* ("the Royal Road to the Interior Lands") passed through the area where Las Cruces was eventually founded. However, because of the area's aridity and the local Native Americans' hostility, very few settlers inhabited the area until the late 1840s. By 1849, though, a

---

[4]In both cases, Weinbaum proceeded pro se before the district court. On appeal, however, he is represented by counsel in Appeal No. 06-2355.

[5]The district court appointed Dr. Jon Hunner, a professor of history at New Mexico State University, as an expert witness pursuant to Rule 706 of the Federal Rules of Evidence. See Las Cruces, 465 F. Supp. 2d at 1171 n.4 (explaining appointment of Dr. Hunner as expert "on the history of Las Cruces, including the historical context of the name, 'Las Cruces,' and the use of crosses within the community of Las Cruces"); see also LCPS I, 465 F. Supp. 2d at 1131 n.17; LCPS II, 465 F. Supp. 2d at 1188 n.5. Dr. Hunner prepared a report entitled "A Report on the Use of Crosses in the City Symbols of Las Cruces." The district court accepted the report, but granted Plaintiffs-Appellants' motion to strike portions of the report that contained legal opinions. See Las Cruces, 465 F. Supp. 2d at 1171 n.4.

village about fifteen miles north of present-day Las Cruces had become overcrowded. The *mayordomo* of that village sought the help of the U.S. Army in resettling some of his townspeople elsewhere. To alleviate the overcrowding, a U.S. Army Lieutenant, Delos Sackett, "laid out a grid of streets using a rawhide rope" at the site of present-day Las Cruces and thereby founded a new town.

Historians have offered two theories regarding the origin of that new town's name, "Las Cruces." Some have argued that the settlement came to be called "Las Cruces" because the Butterfield Overland Mail Route–a trail from San Antonio to California–crossed *El Camino Real* in present-day Las Cruces. As such, Las Cruces was the "crossing" point of the two major trails. In his expert report, however, Dr. Hunner convincingly contends that this account is flawed. Indeed, this account appears anachronistic because the Butterfield Trail did not pass through present-day Las Cruces until the 1850s, a few years after Las Cruces was named.

Instead, Dr. Hunner and other historians argue that the City's name is rooted in the appearance of memorials to the victims of a series of massacres in the area. Dr. Hunner notes that, "[i]n a tradition that continues to this day, crosses have been placed in New Mexico at the site of tragic deaths." Present-day Las Cruces and its surrounding area had a series of such deaths.[6] Thus, Susan Shelby

---

[6]In 1712, Apache marauders killed members of a caravan in the area of present-day Las Cruces. Spanish soldiers arrived after the fact, buried the dead,

(continued...)

Magoffin, a settler, described the Las Cruces area in a diary entry from February 1847: "Yesterday, we passed over the spot where a few years since a party of Apaches attacked Gen. Armijo as he returned from the Pass with a party of troops, and killed some fourteen of his men, the graves of whom, marked by a rude cross, are now seen." By 1849, it seems, a "forest of crosses" stood in the area. Hence, the City's founding as *El Pueblo del Jardin de Las Cruces* ("the City of the Garden of the Crosses").

On the basis of this evidence, Dr. Hunner concludes that "the newly created town in 1849 was named after the crosses that marked the graves of the travelers on the historic trail." Despite Dr. Hunner's conclusions, Plaintiffs-Appellants persisted before the district court in claiming that "Las Cruces" can be translated as "the crossings." See Las Cruces, 465 F. Supp. 2d at 1172. With a nifty bit of forensic etymology, the district court cemented Dr. Hunner's conclusion. The district court noted that the use of the feminine definite article "las" rather than the masculine definite article "los" confirms the fact that "cruces" was intended to be the plural form of "cruz" (a feminine noun meaning "cross"), rather than "cruce" (a masculine noun meaning "crossing"). Id. Accordingly, "if the village had been

_____

[6](...continued)
and erected crosses over the graves. A little over a half century later, "a bishop, a priest, a Mexican army colonel, a captain, four trappers, and four choir boys" were killed in the same area. In 1830, "forty travelers from Taos" suffered the same fate. Finally, just a decade or so later, Native Americans killed fourteen soldiers in a convoy led by General Manuel Armijo, a Mexican governor.

named for crossroads or crossings, it would have been named *Los Cruces*, and not

*Las Cruces*." Id. A second linguistic clue accords with Dr. Hunner's account: the

district court noted that *El Pueblo del Jardin de Las Cruces* is a Spanish

euphemism for a cemetery. Id. at 1173 n.5.

### D. The City's Use of Crosses in its Symbol

In the suit giving rise to Appeal No. 06-2355, the Plaintiffs-Appellants

challenge the City's official symbol (the "symbol" or "seal"). See Att. A. The

symbol consists of three interlocking crosses surrounded by a sun symbol. The

center cross is white and slightly taller than the two outside, blue crosses.

Prior to 1946, however, the City's seal depicted a bunch of grapes. Dr.

Hunner "found no accounts of how the city chose three crosses for its logo."

Nonetheless, his report details what he was able to uncover about the gradual

evolution of the City's symbol and seal.[7]

---

[7]A July 1941 lease agreement between the Town of Las Cruces and Mrs.
A.L. Sweet printed on city letterhead depicts a "a grouping of three crosses, the
middle one larger and taller than the two flanking it" with the motto "The City of
Crosses." In 1946, Mayor Sam Klein requested that a new seal designed by City
Attorney E.G. Shannon replace the old town seal. Shannon's design also included
three crosses. In the City's 1963-1964 Annual Report, however, an unknown
designer added a sunburst around the three independent crosses. A similar
symbol appeared in the 1965 Annual Report. The District borrowed this
particular iteration of the symbol, which now appears on the District's
maintenance vehicles. Dr. Hunner notes that, throughout the 1960s and 1970s,
"the city also used a sunburst with three slanted crosses in front of the Organ
Mountains."

Three Las Cruces residents claim credit for the current City symbol. The
record contains no evidence indicating that any of the three had a religious motive

(continued...)

- 10 -

However it originated, the symbol is currently used as the City's official seal. As such, the symbol appears on Las Cruces public property, including signs, flags, buildings (such as City Hall and the City library), official uniforms (such as those of the City's police and firefighters), and vehicles. Moreover, the symbol appears on public documents including the City's letterhead, notices, maps, brochures, and advertisements. In some cases, the words "City of Las Cruces–For Official Use Only" attend the symbol. The City expended public monies on both the development and distribution of the symbol.

Other entities in Las Cruces have also adopted crosses as part of their trade dress. For example, the Chamber of Commerce adopted a symbol with three crosses in 1970, explaining: "The three crosses were joined at the ends of the transverse bars and at the top of the uprights to combine forever the three cultures basic to the area–Indian, Latin, and Anglo." Many businesses in the area similarly include three crosses in their logos.

**D. The District's Display of Crosses**

In the litigation underlying Appeal No. 07-2012, Weinbaum challenged (1) the symbol that appears on the District's maintenance vehicles, see Att. B; (2) a sculpture located outside the District's Sports Complex, see Att. C; (3) a mural located within Booker T. Washington Elementary ("BTW Elementary"), a District-

---

[7](...continued)
in creating the symbol. In fact, two explicitly denied any such intent.

run school, see Att. D; and (4) the District's Policy # 424, which expounds the District's stance on "Religion In The Schools," see Att. E.

### 1. The Maintenance Vehicle Symbol

As noted above, the City's 1965 Annual Report bore the same symbol that now appears on the District's maintenance vehicles. See App. B. The district court found that the District has marked its maintenance vehicles with the symbol since at least 1969.[8] LCPS II, 465 F. Supp. 2d at 1187. The District currently has a fleet of approximately 35 maintenance vehicles; no other District vehicles sport the symbol.[9] Id. at 1187-88. The District explained that it uses the symbol to identify District vehicles, in part because of the safety implications of having unauthorized or unidentified vehicles on school property. See id. at 1188.

---

[8]After delving into the history of the symbol's use on District vehicles at trial, the district court found that the symbol was likely adopted at the suggestion of a former District Physical Plant Director. LCPS II, 465 F. Supp. 2d at 1188.

[9]The symbol has a diameter of 12 inches and depicts a blue sunburst with three blue crosses in a white ring in the middle of the sunburst. LCPS II, 465 F. Supp. 2d at 1187. The middle blue cross is slightly taller than the two flanking it; each cross is less than two inches tall. Id. Surrounding the sunburst, a blue band contains the words "FOR OFFICIAL USE ONLY." Id. Just outside that band, another blue band contains the words "LAS CRUCES PUBLIC SCHOOLS." Id.

A different symbol appears on all other District property–including buildings, stationary, and official documents. Id. at 1188. This second symbol consists of a Zia sun symbol, flanked by two cacti, with hills and an adobe structure in the background. See App. F. Charles Davis, the Vice President of the District's School Board, explained that the District had the maintenance vehicles prior to the design contest for the new symbol.

2. The Sports Complex Sculpture

The District's regional sports complex features a multi-purpose stadium that seats over 10,000 people. Just a few years after the stadium's completion, the District's Local Selection Committee, in conjunction with New Mexico Arts in Public Places Program, solicited designs for a sculpture that would decorate the south exterior wall of the complex. See LCPS I, 465 F. Supp. 2d at 1122-23. The Committee sought a design that incorporated the theme, "The Pursuit of Excellence." Id. at 1123. A local artist, Ruth Bird, submitted a design plan. Id. After deliberations, the Local Selection Committee picked Bird's design. Id.

Bird entitled her sculpture "Unitas, Fortitudo, Excellentia" ("Unity, Strength, Excellence"). Id. at 1123-24. The artwork features a rusty steel ring with a diameter of 7.5 feet in which an arching stainless steel bar intersects three vertical stainless steel bars of varying lengths. See id. at 1124; see also App. C. The sculpture's title is inscribed in capital letters along the bottom portion of the steel ring. LCPS I, 465 F. Supp. 2d at 1124. An explanatory plaque notes that the "three vertical crosses . . . represent the diverse cross-section of our community," while the "crossbeam represents . . . the 'Pursuit of Excellence.'" Id. at 1145-46 (quotation omitted).[10]

_____

[10]Bird denies that any religious inclination inspired her imagery. See LCPS I, 465 F. Supp. 2d at 1145. Instead, as the plaque states, "[t]he sculpture emphasizes [o]ur strength in unity as a community [a]nd our commitment to excellence." A second plaque credits the New Mexico Arts Office of Cultural

(continued...)

- 13 -

### 3. The Mural at Booker T. Washington Elementary

Weinbaum also challenges a mural located at BTW Elementary. <u>See</u> App. E. A grant from the U.S. Department of Education's 21st Century Community Learning Centers program funded the mural. Between 1998 and 2000, this program disbursed federal grants to school districts to encourage educational projects involving student artwork. <u>See</u> <u>LCPS II</u>, 465 F. Supp. 2d at 1189.

Under BTW Elementary's grant, certain students participated in an after-school program, the Safe After School Program, run by a local non-profit. Third, fourth, and fifth grade participants in the program designed the mural with the help of a New Mexican artist named Ken Wolverton. <u>See</u> <u>id.</u> Wolverton led a brain-storming session with the students, who then decided on the images and materials for the mural. <u>Id.</u> Wolverton then helped the children organize their ideas and transpose their artwork onto the mural's ceramic tiles. <u>Id.</u>

The mural includes five tiles. <u>Id.</u> at 1190. The middle panel depicts three wooden crosses arranged in front of mountains resembling the Organ Mountains, a local topographical feature. <u>See</u> <u>id.</u>; <u>see also</u> App. D. The panel to the left of the middle panel portrays chiles, a chile field, and, again, the Organ Mountains. <u>See</u> <u>LCPS II</u>, 465 F. Supp. 2d at 1190. The panel to the right depicts a yucca plant in bloom and the same mountainous background. The two outmost panels feature a

---

[10](...continued)
Affairs for funding the sculpture. <u>See</u> <u>id.</u> at 1123-24, 1146 n.31.

child holding a book (on the left end panel) and Booker T. Washington (on the right end panel). Id.

Prior to designing the mural, the students decided on where to locate the mural. The students opted for a prominent place in BTW Elementary's hallways. Id. An explanatory plaque credits the 21st Century Community Learning Center for funding and attributes the mural's design to the Safe After School Program's students "with the visual artist Ken Wolverton."[11]  Id.

### 4. Policy # 424

Lastly, the district court construed Weinbaum's pro se pleadings to allege that certain elements of District Policy # 424 (the "Policy"), "RELIGION IN THE SCHOOLS," are unconstitutional and that the District applied the Policy unconstitutionally.

The Policy governs the role of religion in the District's school system. It begins by stating that "[p]ublic schools have the responsibility to teach about religion but shall neither actively sponsor nor interfere with religions." See App. E. Thereafter, the Policy incorporates the three prongs of Supreme Court's Lemon test as a set of guidelines. Id. The Policy comprehensively addresses the various legal limitations and responsibilities that regulate the role of religion in the

---

[11]The district court found that the District's school board never approved the mural's design and that it was not required to do so. Moreover, no one at the District, BTW Elementary, or the non-profit apparently discussed whether the design conformed with the District's policy on religious imagery in the schools (Policy # 424) before the mural was installed. LCPS II, 465 F. Supp. 2d at 1190.

curriculum, the observance of religious holidays, and the depiction of religious symbols. Additionally, the Policy provides that "[r]eligious symbols may be displayed or used as a teach-ing [sic] resource provided no effort is made to impose any particular beliefs which may be associated with such symbols. They may be used as examples of a culture and/or a specific religious heritage." Id.

### F. The District Court's Opinions

In the City symbol case, the court exhaustively explicated the history of the Latin cross as a symbol, the City's history, and the City's use of the contested symbol. With this factual foundation settled, the court turned to the Lemon test, as shaped by subsequent Supreme Court cases. First, the district court held that the City's secular justifications for using its symbol were persuasive because the symbol "literally reflects the name [of the City]." Las Cruces, 465 F. Supp. 2d at 1178. As such, the symbol did not have the "ostensible and predominate purpose of advancing religion." Id. at 1179. Second, the historical context persuaded the court that the symbol does not have the effect of endorsing religion. Id. at 1179-80. Finally, because the City's contested conduct did not involve it with a religious institution, the court held that use of the symbol did not excessively entangle the City with religion. Id. at 1180.

In the companion case, the district court conducted a very similar analysis, but factored in the school context. The court ultimately granted the District summary judgment on the issue of whether the District's display of the Sports

Complex sculpture violates the Establishment Clause. See LCPS I, 465 F. Supp. 2d at 1143-52. Similarly, the court disposed of Weinbaum's facial challenge to District Policy # 424 by granting the District's summary judgment motion. Id. at 1152-54. The court withheld judgment on the maintenance vehicle symbol, the mural, and Weinbaum's suggestion that the District had misapplied Policy # 424 pending further development of the facts at trial. After a bench trial, the district court held that neither the maintenance vehicle symbol nor the mural had the purpose or effect of endorsing religion. LCPS II, 465 F. Supp. 2d at 1193-1200. The court also rejected Weinbaum's as-applied challenge to Policy # 424. Id. at 1197-1200.

Weinbaum appeals the court's grants of summary judgment in both cases, as well as its post-trial decisions. In addition, Weinbaum's pro se brief in No. 07-2012 asserts that the district court was biased against him and identifies a series of decisions by the district court that Weinbaum believes were erroneous.

## II.    Discussion

### A. Jurisdiction

As a threshold matter, Article III requires that the Plaintiffs-Appellants have standing to bring these cases. See O'Connor v. Washburn Univ., 416 F.3d 1216, 1222 (10th Cir. 2005). The district court concluded that Plaintiffs-Appellants had standing. See Las Cruces, 465 F. Supp. 2d at 1165 n.1; LCPS I, 465 F. Supp. 2d at

1125-26.  We review that determination <u>de novo</u>.  <u>See</u> <u>New England Health Care Employees Pension Fund v. Woodruff</u>, 512 F.3d 1283, 1288 (10th Cir. 2008).

"To demonstrate standing, a plaintiff must allege actual or threatened personal injury, fairly traceable to the defendant's unlawful conduct and likely to be redressed by a favorable decision of the court."  <u>Foremaster v. City of St. George</u>, 882 F.2d 1485, 1487 (10th Cir. 1989).  In Establishment Clause cases, "[a]llegations of personal contact with a state-sponsored image suffice to demonstrate . . . direct injury."  <u>O'Connor</u>, 416 F.3d at 1223.

Here, Plaintiffs-Appellants allege that the City's use of its symbol "directly affects [them] because the use is conspicuous, resulting in direct, personal contact with [them]."  Similarly, in his complaint against the District, Weinbaum alleged that "[t]he <u>constant exposure</u> to the typical three Latin crosses found on [District] . . . property is a constant reminder to [him] and his child that they are less that [sic] fully accepted in the community and in the schools."   These facts suffice to show an injury in fact under <u>O'Connor</u>.  <u>See also</u> <u>Reynoldson v. Shillinger</u>, 907 F.2d 124, 125 (10th Cir. 1990) (affording <u>pro se</u> plaintiff's filings some leeway for purposes of standing analysis).  Moreover, the Plaintiffs-Appellants' alleged injuries stem directly from the conduct of the City and the District.  Lastly, in both cases, a favorable judgment from the federal court would redress the injuries.  As

such, the Plaintiffs-Appellants have standing to pursue both cases before this court.[12]  We exercise jurisdiction under 28 U.S.C. § 1291.

### B. Standard of Review

We review <u>de novo</u> a "district court's findings of constitutional fact" and its "ultimate conclusions" regarding a First Amendment challenge.  <u>See</u> <u>Fleming v. Jefferson County Sch. Dist.</u>, 298 F.3d 918, 922-23 (10th Cir. 2002); <u>see also</u> <u>O'Connor</u>, 416 F.3d at 1223; <u>Snyder v. Murray City Corp.</u>, 159 F.3d 1227, 1230 n.7 (10th Cir. 1998) (en banc).  In so doing, we must "make an independent examination of the whole record."  <u>Snyder</u>, 159 F.3d at 1230 n.7 (quotation omitted); <u>see also</u> <u>O'Connor</u>, 416 F.3d at 1223.  This independent review facilitates the courts' "control of . . . the legal principles governing the factual circumstances necessary to satisfy" Establishment Clause protections.  <u>Fleming</u>, 298 F.3d at 922 (quoting <u>Lilly v. Virginia</u>, 527 U.S. 116, 136 (1999)).

---

[12]We also conclude that Weinbaum has prudential standing to bring his claim against the District.  As noted above, Weinbaum did not assert Establishment Clause claims on behalf of his daughter Olivia in the litigation underlying Appeal No. 07-2012.  Rather, the essence of his claim is that he suffered a cognizable injury under the Establishment Clause because the District's actions infringe on <u>his</u> right to direct the religious education of his daughter.  Because Weinbaum has asserted that District's conduct violates <u>his</u> First Amendment rights, this court need not invoke "judicially-imposed limits" on its power to hear this case.  <u>See</u> <u>Sch. Dist. of Abington Twp. v. Schempp</u>, 374 U.S. 203, 225 n.9 (1963) (holding that parents "directly affected by the laws and practices against which their complaints are directed" surely have cognizable interests for standing purposes).

With respect to the district court's grants of summary judgment to the City and the District, we must ensure that "there is no genuine issue as to any material fact" and that the City is "entitled to judgment as a matter of law." FED. R. CIV. P. 56(c). We "view the evidence and draw reasonable inferences therefrom in the light most favorable to the nonmoving party." Grace United Methodist Church v. City of Cheyenne, 451 F.3d 643, 649 (10th Cir. 2006) (quotation omitted).

Lastly, in considering Appeal No. 07-2012, we must "construe[] liberally" Weinbaum's pro se pleadings. Hall v. Bellmon, 935 F.2d 1106, 1110 (10th Cir. 1991). We need not, however, act as Weinbaum's advocate. Id.

**C. The First Amendment's Establishment Clause**

The first clause of the First Amendment provides, "Congress shall make no law respecting an establishment of religion . . . ." U.S. CONST. amend. I. This substantive limitation applies also to the "legislative power of the States and their political subdivisions" as a result of the Fourteenth Amendment. Santa Fe Indep. Sch. Dist. v. Doe, 530 U.S. 290, 301 (2000). "At its core, the Establishment Clause enshrines the principle that government may not act in ways that 'aid one religion, aid all religions, or prefer one religion over another.'" Snyder, 159 F.3d at 1230 (quoting Lee v. Weisman, 505 U.S. 577, 600 (1992) (Blackmun, J., concurring)); see also O'Connor, 416 F.3d at 1223.[13]

---

[13]Some doubt the historical provenance of the neutrality principle. See, e.g., McCreary County v. ACLU of Ky., 545 U.S. 844, 885-90 (2005) (Scalia, J.,

(continued...)

Despite scattered signals to the contrary,[14] the touchstone for Establishment

Clause analysis remains the tripartite test set out in Lemon.  See Utah Gospel

Mission, 425 F.3d at 1258-59; O'Connor, 416 F.3d at 1223-24; Gaylor v. United

States, 74 F.3d 214, 216 (10th Cir. 1996).  To pass constitutional muster, the

---

[13](...continued)
dissenting) (criticizing the principle as "a thoroughly discredited [judicial] say-
so"); cf. Michael W. McConnell, *Establishment and Disestablishment at the
Founding, Part I: Establishment of Religion*, 44 WM. & MARY L. REV. 2105, 2108
(2003) (noting that Justices of the Supreme Court have tended to ignore one side
of the establishment debate during the Founding Era–the pro-establishment side);
Steven G. Gey, *Reconciling the Supreme Court's Four Establishment Clauses*, 8
U. PA. J. CONST. L. 725, 728-64 (2006) (listing ten different tests that the Court
has applied in Establishment Clause cases and noting that some of those tests
ignore the neutrality principle).
    Regardless, even after the Supreme Court decided the twin Decalogue cases
in 2005 – McCreary and Van Orden v. Perry, 545 U.S. 677 (2005) – this court has
concluded that the Supreme Court's Establishment Clause jurisprudence continues
to "mandate governmental neutrality between religion and religion, and between
religion and nonreligion." O'Connor, 416 F.3d at 1223 (quoting Epperson v.
Arkansas, 393 U.S. 97, 103-04 (1968)) (alteration omitted); cf. Utah Gospel
Mission v. Salt Lake City Corp., 425 F.3d 1249, 1260 (10th Cir. 2005).

    [14]Supreme Court Justices have harshly criticized Lemon.  See McCreary,
545 U.S. at 890 (Scalia, J., dissenting) (noting that "a majority of the Justices on
the current Court . . . have, in separate opinions, repudiated the brain-spun
'Lemon test'"); Van Orden, 545 U.S. at 693-94 (Thomas, J., concurring); see also
Bauchman v. West High Sch., 132 F.3d 542, 551 (10th Cir. 1997) (listing cases).
In Van Orden, the plurality even noted that the Court had previously declined to
apply the Lemon test in certain Establishment Clause cases.  Van Orden, 545 U.S.
at 685-86 (Rehnquist, C.J., plurality opinion).  Nevertheless, the Lemon test
clings to life because the Supreme Court, in the series of splintered Establishment
Clause cases since Lemon, has never explicitly overruled the case.  See Utah
Gospel Mission, 425 F.3d at 1259; O'Connor, 416 F.3d at 1224.  While the
Supreme Court may be free to ignore Lemon, this court is not.  See O'Connor,
416 F.3d at 1224 ("Until the Supreme Court overrules Lemon, however, it
remains binding law in this circuit.").

governmental action (1) "must have a secular legislative purpose," (2) its "principal or primary effect must be one that neither advances nor inhibits religion," and (3) it "must not foster an excessive government entanglement with religion."  Lemon, 403 U.S. at 612-13 (quotation omitted).

This court "interpret[s] the purpose and effect prongs of Lemon in light of Justice O'Connor's endorsement test."  O'Connor, 416 F.3d at 1224 (citing Lynch v. Donnelly, 465 U.S. 668, 687-94 (1984) (O'Connor, J., concurring)).  Under the "endorsement test," the "government impermissibly endorses religion if its conduct has either (1) the purpose or (2) the effect of conveying a message that religion or a particular religious belief is favored or preferred."  Bauchman, 132 F.3d at 551 (quotation omitted); see also County of Allegheny v. ACLU, 492 U.S. 573, 592-93 (1989) (noting that the Court has increasingly asked whether the challenged governmental conduct endorses religion).

To sum up, the hybrid Lemon/endorsement test has three prongs.  See O'Connor, 416 F.3d at 1224.  The first two echo Lemon's first two tests; specifically, these prongs focus on whether the government conduct was motivated by an intent to endorse religion or whether the conduct has the effect of endorsing religion.[15]  O'Connor, 416 F.3d at 1224-25, 1227-28; see also Lynch, 465 U.S. at

_____

[15]Of course, in other situations, the issues probed by the first two prongs would be framed in the converse: whether the government's actual purpose was to disapprove of religion and whether the governmental conduct has the effect of disfavoring a certain religion or religion generally.  See O'Connor, 416 F.3d at

(continued...)

690-92 (O'Connor, J., concurring).  Finally, in certain cases where the government involves itself with a religious institution, Lemon's excessive entanglement prong comes into play.  See, e.g., Utah Gospel Mission, 425 F.3d at 1261.

Applying the first two prongs involves an objective inquiry.  In deciding whether the government's purpose was improper, a court must view the conduct through the eyes of an "'objective observer,' one who takes account of the traditional external signs that show up in the 'text, legislative history, and implementation of the statute,' or comparable official act."  McCreary, 545 U.S. at 862 (quoting Santa Fe, 500 U.S. at 308); see also O'Connor, 416 F.3d at 1225.

We must also consider the government's secular justification for its challenged conduct when applying the purpose prong.  See Utah Gospel Mission, 425 F.3d at 1259; see also King v. Richmond County, 331 F.3d 1271, 1277 (11th Cir. 2003) (noting that courts should consider government's professed justification when traditional external signs are absent or ambiguous).  Unless the secular justification is a "sham" or is "secondary" to a religious purpose, we defer to the government's professed purpose for using the symbol.  See McCreary, 545 U.S. at 864; Utah Gospel Mission, 425 F.3d at 1259.  We will not lightly "attribut[e] unconstitutional motives to the government, particularly where we can discern a plausible secular purpose."  Bauchman, 132 F.3d at 554.  Finally, we must

---

[15](...continued)
1224-25, 1228.

scrutinize the <u>government's</u> intent; thus, where the challenged conduct is the selection or display of artwork, the artist's inspiration or intent is irrelevant. <u>O'Connor</u>, 416 F.3d at 1225 n.3.

Similarly, the "effect" prong looks through the eyes of an objective observer who is aware of the purpose, context, and history of the symbol. The objective or reasonable observer is kin to the fictitious "reasonably prudent person" of tort law. See <u>Gaylor</u>, 74 F.3d at 217. So we presume that the court-created "objective observer" is aware of information "not limited to 'the information gleaned simply from viewing the challenged display.'" <u>O'Connor</u>, 416 F.3d at 1228 (quoting <u>Wells v. City & County of Denver</u>, 257 F.3d 1132, 1142-43 (10th Cir. 2001)).[16] If a government symbol has long gone unchallenged, there is a suggestion that an objective observer would not think that the symbol endorses a religious message. See <u>Van Orden</u>, 545 U.S. at 702 (Breyer, J., concurring in judgment) (noting that display of Decalogue on Texas Capitol's grounds had gone legally unchallenged for forty years); <u>see also</u> <u>Card v. City of Everett</u>, 520 F.3d 1009, 1021 (9th Cir.

---

[16]Undoubtedly, the "objective observer" is presumed to know far more than most actual members of a given community. <u>Cf.</u> <u>ACLU of Ohio v. Capitol Square Review & Advisory Bd.</u>, 243 F.3d 289, 303 (6th Cir. 2001). This heightened standard recommends the test. By setting the bar at this level, the courts encourage those who would challenge government conduct to investigate the conduct carefully, by examining the purpose, context, and history of the conduct. If, after such scrutiny, they remain convinced that the government has endorsed religion, they may well have identified an actual violation of the Establishment Clause.

2008); Skoros v. City of New York, 437 F.3d 1, 44 (2d Cir. 2006), cert. denied, 127 S. Ct. 1245 (2007) (Straub, J., concurring in part, dissenting in part).

The school context changes these objective inquiries only slightly. Because "attendance is involuntary" and children may be impressionable, "[t]he Court has been particularly vigilant" in ensuring that schools comply with the Establishment Clause. Edwards v. Aguillard, 482 U.S. 578, 583-84 (1987); see also Van Orden, 545 U.S. at 690-91 (Rehnquist, C.J., plurality opinion).

With this in mind, we must conjure a slightly different objective observer for purposes of challenges to a school district's conduct. The Supreme Court has in one case considered an Establishment Clause challenge from the perspective of "an objective Santa Fe High School student," see Santa Fe, 530 U.S. at 308. In another First Amendment case, this court has analyzed whether "students, parents, and members of the public might reasonably perceive" that government conduct "bear[s] the imprimatur of the school." See Roberts v. Madigan, 921 F.2d 1047, 1057 (10th Cir. 1990) (quoting Hazelwood Sch. Dist. v. Kuhlmeier, 484 U.S. 260, 271 (1988)). In yet another case, the Supreme Court expressly declined any Establishment Clause standard that would bar "a group's religious activity . . . on the basis of what the youngest members of the audience might misperceive." Good News Club v. Milford Cent. Sch., 533 U.S. 98, 119 (2001). Notwithstanding these varying articulations, each of these cases seems to be focused on the same standard: an objective standard based on reasonableness and informed knowledge,

with due consideration for the concern that school children will see the governmental message or symbol.

In addressing this issue, the district court below relied on the analysis of a divided panel of the Second Circuit in Skoros. See LCPS I, 465 F. Supp. 2d at 1138-39. The Skoros majority held:

> [T]he relevant objective observer . . . is an adult who is aware of the history and context of the community and forum in which the religious display appears, and who understands that the display of a religious symbol in a school context may raise particular endorsement concerns, because of the pressure exerted on children by the law of imitation.

Skoros, 437 F.3d at 30 (internal citations and quotations omitted).[17] The Second Circuit's conclusion accords with Justice O'Connor's understanding of the endorsement test. See Elk Grove Unified Sch. Dist. v. Newdow, 542 U.S. 1, 40 (2004) (O'Connor, J., concurring) ("[T]he relevant viewpoint is that of a reasonable observer, fully cognizant of the history, ubiquity, and context of the practice in question."). The Second Circuit articulation, adopted by the district court below, seems to us a reasonable assimilation of the various articulations of the test that are out there.

---

[17]The dissenter on this point argued that the relevant objective observers are both (1) the "students in the [New York City] elementary and secondary public schools" and (2) their parents. Skoros, 437 F.3d at 50 (Straub, J., concurring in part, dissenting in part). However, having two different sets of objective observers would render the objective test more indeterminate and, perhaps at times, inconsistent.

With these principles in mind, we turn to the instant Establishment Clause claims. In Appeal No. 06-2355, the Plaintiffs-Appellants argue only that the City symbol has the effect of endorsing Christianity. Likewise, in his pro se brief submitted in Appeal No. 07-2012, Weinbaum argues that the District's sculpture, maintenance vehicle symbol, mural and policy have the effect of endorsing Christianity. But we construe his brief also to contend that the District had an unconstitutional motive in selecting and displaying the sculpture and mural. Neither appeal advances an excessive entanglement argument.

### 1. The Las Cruces City Symbol

The issue here is whether the City's symbol has the effect of endorsing Christianity. We first consider the objective perception of the symbol's purpose because purpose may lend some evidentiary weight to an inquiry of effect. Effects are most often the manifestations of a motivating purpose. As background, we note that the evidence regarding the City's adoption of the symbol is indeterminate, but there is no evidence that the City's purpose was to advance religion. However, the City offered various secular justifications for the symbol, including identification of City property and identification with the City's unique historical name. We presume, then, that an objective observer would not conclude that the City adopted the symbol with the purpose of endorsing Christianity.

We turn next to what context and history would tell an objective observer about the symbol's effect. Context carries much weight in the Establishment Clause calculus. See McCreary, 545 U.S. at 867 ("[U]nder the Establishment Clause detail is key."); O'Connor, 416 F.3d at 1222 ("Establishment Clause questions are heavily dependent on the specific context and content of the display."). History is a critical aspect of the context of the City's seal; accordingly, under our hybrid test, we presume the objective observer's familiarity with the City's history. See McCreary, 545 U.S. at 866 (noting that objective observer is "presumed . . . competent to learn what history has to show"); Gaylor, 74 F.3d at 217.

Here, Las Cruces's unique history explains why the City's name translates as "The Crosses" and, relatedly, why the City uses crosses in its symbol. Dr. Hunner – the Rule 706 expert – established that the City's name derives from its founding near the site of a make-shift cemetery. Thus, the City's name derives from the "forest of crosses" that once memorialized those massacred in the area. This history is not arcane; in fact, the City has made these historical facts readily available in an explanatory brochure, "History of the Crosses: How Las Cruces Got Its Name," which Dr. Hunner's report substantiates. See O'Connor, 416 F.3d at 1228 (noting that "reasonable observer" would consider readily available explanatory brochure). The brochure explains that clusters of crosses stood in the area to commemorate "the gravesites [sic] of people who traveled through or

populated the area nearly two centuries ago."  Because a city's symbol is shorthand for the entity itself–a pictograph of sorts–the use of crosses makes intuitive sense for a city named "The Crosses."[18]  Thus, the City's unique history militates against the argument that the symbol's effect is to endorse Christianity.

It is also important here to observe the widespread use of multiple crosses throughout the community to signify a connection to the City.  Rather than being a unique effort by the City to advance religion, it appears that symbols containing multiple crosses identify many secular businesses within the Las Cruces community.  The use of crosses, by all accounts, is common in Las Cruces, even setting aside the City's use of its symbol.  As such, our concern that the City's imprimatur attends the symbol's religious imagery dissipates.  In this context, the objective observer would not be struck by the City's

------

[18]American towns, cities, and counties commonly incorporate the subject matter of their name into their seals and flags.  For example, the seal of Columbus, Ohio, predictably depicts one of Christopher Columbus's vessels (the otherwise nondescript sailing vessel is identified as such by a red Latin cross on the mainsail).  See Wikipedia, Columbus, Ohio, http://en.wikipedia.org/wiki/Columbus%2C_Ohio.  Similarly, the seal of Long Beach, California, depicts a long beach, see Wikipedia, Long Beach, California http://en.wikipedia.org/wiki/Long_Beach%2C_California. Anchorage, Alaska, displays an anchor and a sailing ship on its seal and flag, see Wikipedia, Anchorage, Alaska, http://en.wikipedia.org/wiki/Anchorage%2C_Alaska, and the City of Palo Alto, which translates as "Tall Tree," displays a tall tree on its seal, see City of Palo Alto, Independent Police Auditor's Interim Report 1 (2008), available at http://www.cityofpaloalto.org/depts/pol/police_information/default.asp (last visited August 19, 2008).

incorporation of crosses into its symbol and would not see that symbol as an endorsement of Christianity.

Friedman v. Board of County Commissioners of Bernalillo County, 781 F.2d 777 (10th Cir. 1985) (en banc), is easily distinguishable. There the dominant symbol in the seal of Bernalillo County was a radiant cross. Id. at 779. Directly over it was the statement, in Spanish, "With This We Overcome." Id. The obvious meaning, which was confirmed by testimony, was that the County shall overcome with the power of the Christian cross. The religious significance of the seal is manifest. Even the County's purported secular interpretation was essentially religious in nature. The secular explanation was that the imagery alluded to the Spanish conquistadors who, accompanied by Catholic priests and friars, conquered the indigenous population of the area. But that explanation unmistakably suggests that it was the force of the Christian faith that powered the conquest and that it will continue to enable the County to overcome.[19] Thus, there was "persuasive" evidence in the record that the "leads the average observer to the conclusion that the county government was 'advertising' the Catholic faith." Id. at 781. In light of the absence of any credible secular

---

[19]To underscore the religious imagery of the seal, underneath the cross was a flock of sheep. Although again there was a post hoc effort to suggest that the imagery referred to sheep-raising activity in the area, the most obvious interpretation of the flock, as it appears under the radiant cross, is that it referred to the followers of Jesus.

historical explanation for this seal and its strongly suggestive religious content, it is not at all surprising that we held that seal to be a violation of the Establishment Clause.

Robinson v. City of Edmond, 68 F.3d 1226 (10th Cir. 1995), is a closer case, but the seal of Edmond, Oklahoma, also contained unabashed Christian symbolism. The Edmond seal was divided into quadrants, each apparently representing an important aspect of the history and life of Edmond. 68 F.3d at 1228. Three of the quadrants contained secular symbols: a train and oil derrick, a sooner wagon, and the Old North Tower, a local landmark and former institution of higher learning. Id. But the fourth contained the Christian cross. Id. The putative secular explanation of the Christian cross was that it reflected the Christian heritage of the area but that, of course, is not a secular explanation at all. Whether the religious symbolism refers to recent or long-standing values of a city, it is equally religious in nature. The principal issue in Robinson was whether the religious component of one quadrant of the seal could be diluted by the secular components of the other three quadrants. We held it could not. So, that case stands for the unremarkable proposition that a seal which contains an unambiguous religious symbol could not pass muster under the Establishment Clause.

The seal of Las Cruces presents an altogether different situation. Compelling evidence here establishes that the symbolism is not religious at all. Rather, it simply reflects the name of the City which, in turn, reflects a series of secular events that occurred near the site of the City. Unless one were to attack the very name of the City itself – an attack which is not advanced here – it is hardly startling that a City with the name "The Crosses" would be represented by a seal containing crosses. And indisputable evidence showed that even the name of the City reflected merely the cemetery, representing the violence in the area rather than proselytizing forces in general or a particular faith. So here, unlike in Robinson or Friedman, we have a secular symbol, which could be, and was, understood to be secular by the residents of the City.[20]

A closer analogy to the Las Cruces seal is the seal of Austin, Texas, at issue in Murray v. City of Austin, 947 F.2d 147 (5th Cir. 1991). There, a divided panel of the Fifth Circuit held that the city insignia of Austin, Texas, did not violate the Establishment Clause. Id. at 158. The insignia, derived from Stephen F. Austin's family coat of arms, is topped by a Latin cross flanked by a pair of wings. See id. at 149-50. The majority concluded that the insignia had a close connection to the city's namesake. Relying on the "long-standing unique

_____

[20]We note here that the use of three crosses in the City seal has gone legally unchallenged for at least forty years. See Van Orden, 545 U.S. at 702 (Breyer, J., concurring in judgment); see also Card, 520 F.3d at 1021.

history" of the insignia and the fact that there was "absolutely no evidence of an intent to proselytize, or advance, any religion," the panel distinguished <u>Friedman</u> and <u>Robinson</u> and held that the insignia did not have the effect of advancing religion. <u>Id.</u> at 155.

What makes this case close is the City's use of <u>three</u> crosses, and the fact that the middle cross stands taller than the outside crosses. Still, the effect of the seal is not to endorse Christianity. First, because the City is called "The Crosses," of course, the use of multiple crosses makes sense. Questioning the exact number of crosses or their layout would "immerse[] [us] in the minutiae of graphic design," <u>Murray</u>, 947 F.2d at 170 (Goldberg, J., dissenting), an untenable position we have pledged to avoid, <u>see</u> <u>Robinson</u>, 68 F.3d at 1233. Second, we return to the fact that the Las Cruces community uses the crosses the way Palo Alto uses the tall green tree. The effect of these symbols is to identify the cities by referring (via pictographic shorthand) to the cities' names. In light of Las Cruces's name and history, we conclude that the symbol does not have the effect of endorsing Christianity.

### 2. The Maintenance Vehicle Symbol

Weinbaum also challenges the use of a symbol very similar to the City's seal on the District's maintenance vehicles. He asserts that the vehicles' symbol has both the purpose and effect of endorsing Christianity. We disagree.

- 33 -

The symbol on the maintenance vehicle confirms that the vehicles are associated with the District and the City. Weinbaum conceded that this is critical on school campuses, where safety concerns require that teachers, administrators, and parents be able to identify vehicles. More importantly, in Las Cruces's unique context, the crosses signal an association with the City. Having generally approved the seal of Las Cruces, we have no difficulty approving a fairly similar representation of the District on its vehicles.[21]

### 3. The Sports Complex Sculpture

Weinbaum advances similar claims about the sculpture located at the District's Sports Complex. As did the district court, we reject his claims.

Here, the record relates little regarding the District's actual purpose for selecting and displaying the sculpture. The District offered three secular justifications for its selection and continued display of the sculpture: (1) the sculpture beautifies the Sports Complex; (2) it is a monument to the pursuit of excellence; and (3) it embodies the community of Las Cruces. See LCPS I, 465 F. Supp. 2d at 1143-44.

---

[21]Additionally, we note that Weinbaum offered no evidence regarding the District's purpose in adopting the symbol. Objectively, we see no reason whatsoever to conclude that the District intentionally adopted the symbol to endorse religion.

An objective observer familiar with the sculpture's context and history would not find that the District's actual purpose in selecting or displaying the sculpture was to endorse Christianity. Weinbaum failed to raise any genuine issue of material fact in this regard. Rather, he essentially rested on (1) the fact that the sculpture contains three crosses, (2) the artist's religious beliefs and (3) unsupported insinuations stemming from the religious beliefs of certain District officials. For the reasons below, we conclude that Weinbaum's claim does not warrant a trial.

At first glance, the crosses in the sculpture are stylized and bear only a fleeting resemblance to the standard Calvary scene. However, even if the sculpture's crosses were a more typical representation of Calvary, Las Cruces's name and history eclipse the Christian symbolism. As discussed above, the City identifies with the crosses because of its unique history. The explanatory plaques corroborate this connection to the community. Further, because Weinbaum offered no credible evidence of an ex ante improper motive, the District may offer "campus beautification [as] a permissible justification" for selecting and displaying the sculpture. O'Connor, 416 F.3d at 1226. Nothing in the record suggests that this proffered secular motive – nor, for that matter, any of the District's other justifications – is a sham.

Moreover, Weinbaum cannot reach a jury merely by insinuating that members of the School Board acted with improper motives because of their personal beliefs. See Munoz v. St. Mary-Corwin Hosp., 221 F.3d 1160, 1164 (10th Cir. 2000) (holding that the non-moving party "must present sufficient evidence in specific, factual form for a jury to return a verdict in that party's favor" (quotation omitted)); cf. McCreary, 545 U.S. at 863 ("If someone in the government hides religious motive so well that the objective observer . . . cannot see it, then without something more the government does not make a divisive announcement that in itself amounts to taking religious sides." (quotation omitted)). And Weinbaum's allegations regarding the artist's beliefs and intent are irrelevant to our analysis of the District's motive. See O'Connor, 416 F.3d at 1225 n.3.[22]

Similarly, there is no material dispute about the objective effect of the sculpture. Cognizant of the sculpture's purpose, context, and history, the objective observer would recognize that the sculpture does not have the effect of endorsing Christianity. The sculpture's name, "Unitas, Fortitudo, Excellentia," alludes to the Olympic spirit, not to any shrouded religious themes. Cf.

_____

[22]Having concluded that the District's purpose for selecting the sculpture was permissible, we also concur with the district court's decision regarding the District purpose in continuing to display the sculpture. Weinbaum's arguments in this regard lack evidentiary support and thus fail to create a material factual dispute.

International Olympic Committee, The Olympic Charter 11 (October 2007), available at http://multimedia.olympic.org/pdf/en_report_122.pdf. Similarly, the sculpture's explanatory plaque elucidates the District's secular rationale for displaying the sculpture. As stated on the plaque, the sculpture intends to evoke the Las Cruces community and the hope that they would, as one, witness excellence at the Sports Complex.

4. The Mural

After trial, the district court held that there was no evidence that the District's actual purpose in sanctioning the BTW mural was to advance religion. In addition, the court held that the District's secular justification for the mural's content–namely that student participants in an after-school program created the artwork–was genuine. See LCPS II, 465 F. Supp. 2d at 1197. Weinbaum again rested his case on the fact that the mural contains crosses. The district court rightly concluded that (1) the mural's display was not motivated by the intent to endorse religion and (2) the mural does not have the effect of endorsing religion.

First, the District had nearly nothing to do with the mural's creation. Weinbaum instead must argue that the continued display of the mural establishes the District's impermissible motive. Unlike the Kentucky statute struck down in Stone v. Graham, 449 U.S. 39, 39-40 (1980), which mandated the display of the Decalogue in every public classroom in the state, the District's display of the

mural has plausible secular justifications. BTW Elementary children created the collage, taking the images from the school's neighborhood and the Las Cruces community. The mural identifies unique aspects of BTW. Moreover, display of the mural recognizes the work of the "latch-key" students who participated in the after-school program. Weinbaum points only to the mural's content, declining to address its context and history. As such, Weinbaum cannot unseat the District's secular justifications.

Second, an objective observer would not believe that the BTW Elementary mural has the effect of endorsing religion. The third, fourth, and fifth grade students who designed the mural saw the crosses as emblematic of their community, and not of Calvary. The mural's gestalt corroborates this connotation of the crosses. Chiles, chile fields, a yucca plant, and the Organ Mountains place the crosses in context, namely the Las Cruces community, thereby emphasizing the local character of the collage's imagery.[23] Cf. Van

---

[23]The outermost images specifically connect the collage to BTW Elementary. John Schultz, the District's former Coordinator for the Visual and Performing Arts, testified that BTW Elementary is one of the oldest schools in the community and, before desegregation, was the African-American school in Las Cruces. Thus, the image of a young, African-American child with a book on one end, and a depiction of Booker T. Washington himself on the other, tie the artwork to a unique community and school.

Orden, 545 U.S. at 681 (Rehnquist, C.J., plurality opinion) (discussing

Decalogue monument in context of other nearby monuments to Texan history).[24]

5. Policy # 424

As discussed above, Weinbaum also challenges the very District policy

that ensures compliance with the Establishment Clause.  Yet, the objective

observer would understand the measured tenor of the Policy from its very first

sentence: "Public schools have the responsibility to teach about religion but shall

neither actively sponsor nor interfere with religions."  The Policy sensibly and

comprehensively addresses the issues implicated by teaching that touches on

religion.[25]  Nothing in the Policy, as written, creates doubts about its neutrality.

See Good News Club, 533 U.S. at 114 (noting that the Establishment Clause's

---

[24]The trial testimony also alleviates concerns about the effect the mural might have on BTW Elementary students.  For example, one witness testified that District students begin learning about local history in kindergarten.  This provides assurance that BTW Elementary students, like the objective observer attuned to the City's history, see the crosses in a different light.  Although another witness mentioned that churches in the community also display crosses, he went on to list other secular entities in BTW Elementary's neighborhood that display three crosses to demonstrate a connection to Las Cruces.

[25]Weinbaum protests that the Policy uses the singular "religion" instead of "religions."  This, he claims, shows that the Policy "condones the advancement of the teachings of a singular religion in the public schools."  See LCPS I, 465 F. Supp. 2d at 1152 (quotation omitted).  The district court rightfully rejected this contention.  In contemporary diction, the term "religion" connotes more than just one particular religion.

"guarantee of neutrality is respected, not offended, when the government, follow[s] neutral criteria and evenhanded policies" (quotation omitted)).

Weinbaum acknowledged on the witness stand that, other than the maintenance vehicle symbol and the BTW Elementary mural, he had no evidence that the District has misapplied Policy # 424. Having affirmed the vehicles' symbol and BTW's mural, we reject Weinbaum's as-applied claim.

In sum, Weinbaum offered no evidence that persuades us that the Policy, in any way, violates the Establishment Clause. Nor has he adduced evidence to suggest that the District has applied the Policy unconstitutionally.

### 6. Summary Judgment in Establishment Clause Cases

Finally, we address whether granting summary judgment on certain claims below was permissible under our Establishment Clause jurisprudence. Our Lemon/endorsement test is an "objective inquiry," and we accordingly do not ask "whether particular individuals might be offended" by the government's conduct. Bauchman, 132 F.3d at 555. We need not sift through empirical evidence–polling data, statistics, or the like–because we need "not ask whether there is any person who could find an endorsement of religion . . . or whether some reasonable person might think [the State] endorses religion." Capitol Square Review & Advisory Bd. v. Pinette, 515 U.S. 753, 780 (1995) (O'Connor, J., concurring) (quoting Ams. United for Separation of Church and State v.

Grand Rapids, 980 F.2d 1538, 1544 (6th Cir. 1992) (en banc)) (brackets in original). Instead, we must simply view the symbol through an objective observer's eyes. Accordingly, the question can be decided as a matter of law, and is therefore appropriate for summary judgment on a sufficient record. See O'Connor, 416 F.3d at 1231 n.7. We conclude that the record supported the district court's grants of summary judgment, as well as the court's post-trial judgments.

### D. Weinbaum's Assorted Other Complaints

Lastly, in Appeal No. 07-2012, Weinbaum asserts that the district court erred in (1) denying Weinbaum's motion to put on a witness not listed in his initial pretrial order; (2) relying on Dr. Hunner as an expert regarding Las Cruces's history; and (3) refusing to consider an investigative report that Weinbaum prepared regarding the District's selection of the Sports Complex sculpture. Additionally, Weinbaum argues that the district court was biased against him.

"We review a district court's evidentiary decisions for an abuse of discretion." McInnis v. Fairfield Cmtys., Inc., 458 F.3d 1129, 1141 (10th Cir. 2006). And we review Weinbaum's challenge to the district court's impartiality using that same standard. See Sac & Fox Nation v. Cuomo, 193 F.3d 1162, 1168 (10th Cir. 1999).

Having scrutinized the record and construed Weinbaum's arguments liberally, we see no reversible error in the district court's evidentiary decisions. Similarly, we reject Weinbaum's argument that the district court was biased against his position.

## III.    Conclusion

In the past, we have expressed concern that "[w]ith no principled basis for distinguishing one seal from the next, our opinions will be fastidiously fact-bound and our precedent hopelessly abstract."  Robinson, 68 F.3d at 1233 (quoting Murray, 947 F.2d at 170 (Goldberg, J., dissenting)).  But the Supreme Court has advised that, in Establishment Clause cases, "the inquiry calls for line drawing; no fixed, per se rule can be framed."  Lynch, 465 U.S. at 678.

These cases are the type that preclude a mechanical rule.  Unequivocally, the City and District are currently displaying symbols and artwork that might be constitutionally suspect in some other American communities or in other contexts.  But, Las Cruces is the "City of Crosses" and the use of crosses as a symbol therein is not a religious statement.  As such, the City and District's religious symbols "are not minor trespasses upon the Establishment Clause to which [we] turn a blind eye.  Instead, their  history, character, and context prevent them from being constitutional violations at all."  Newdow, 542 U.S. at

37 (O'Connor, J., concurring).  Because these cases are unique, a resolution tied to reason makes more sense than a sweeping per se rule.  We **AFFIRM**.

# ATTACHMENT A



# ATTACHMENT B



 

# ATTACHMENT D





# ATTACHMENT E

Procedure #424 — RELIGION IN THE SCHOOLS
Rev. 7.99

Public schools have the responsibility to teach about religion but shall neither actively sponsor nor interfere with religions. The district recognizes that religion has played an undeniable role in the formation of world civilizations, the foundation of our country and the lives of its citizens. The place of religion in our society should be recognized as an important one.

The proper role of religion in the public schools is in its educational value and nonreligious observance or celebration. The schools can play a vital role in bringing about an understanding between peoples of different backgrounds. In that capacity and when appropriate within the curriculum, the schools are valuable in teaching our children about various belief systems. Belief systems will be discussed in an atmosphere of tolerance and mutual respect. Intercultural programs or curriculum focusing on the role that religion has played in history, literature or in the development of society and the influence that religion has had on historical figures or movements are acceptable and desirable. It is anticipated that students will also develop tolerance and mutual respect as they become aware of diverse belief systems and their current and historical impact on human culture.

A. RELIGION IN THE CURRICULUM

1. When religion is included in the curriculum as part of the study of art, literature, history, etc., it should be treated with the same objectivity and educational intent expected in other areas. Such studies should not foster any particular religious tenet or demean any religious belief.

2. Materials and activities should be sensitive to the diversity of belief systems.

3. Instructional activities addressing religion should meet the three-part test established by the Supreme Court to determine constitutionality:

   a. The activity must have a secular purpose.

   b. The activity's principal or primary effect must be one that neither advances nor inhibits religion.

   c. The activity must not foster an excessive govern- mental entanglement with religion.

4. When the subject of religion occurs naturally in studying other topics such as history, literature, culture, etc., it should be treated as part of that study. (For example: Study of American Indians, the Pilgrims, Greek mythology or the Crusades may be enhanced by the inclusion of the role of religion.)

5. Student initiated responses to questions or assignments which reflect their beliefs or nonbeliefs about a religious theme will be accommodated when appropriate. (For example: Students are free to express religious beliefs or nonbeliefs in compositions, art forms, music, speech, and debate.)

0961

6. Students should be taught to develop an appreciation of the value of religious liberty as guaranteed by the United States Constitution.

7. The teaching of theories to promote a religious doctrine is not permitted. Religious theories/beliefs shall not direct curriculum content.

B. RELIGIOUS HOLIDAYS, SCHEDULES, ABSENCES

1. The origin and significance of diverse holidays shall be presented in an unbiased manner without religious indoctrination. Holiday activities should not be religious in nature. These activities may include the singing of some holiday songs with religious content, but must also include a balanced variety of music not solely of a religious nature. Such programs shall not include performances of religious dramas.

2. Neither instructional materials nor assembly programs may be used to promote, encourage or denigrate specific religious groups or religious activities.

3. Religious celebrations outside of school shall not be endorsed by the school district or by school personnel in school.

4. The district's calendar shall be prepared so as to minimize conflict with religious holidays. Where con- flicts are unavoidable, care should be taken to avoid tests, special projects, introduction of new concepts and other activities which would be difficult to make up.

C. RELIGIOUS SYMBOLS

Definition: A religious symbol is any object which portrays or represents a religious belief. A religious symbol can also be an object which is so closely associated with religion(s) or with the celebration of a religious holiday that it is commonly perceived as being of a religious nature.

1. Religious symbols may be displayed or used as a teach- ing resource provided no effort is made to impose any particular beliefs which may be associated with such symbols. They may be used as examples of a culture and/or a specific religious heritage.

2. Whenever appropriate, teachers are encouraged in their presentations to expose students to symbols and tradi- tions from a variety of cultures.

3. Religious symbols may be displayed for show-and-tell or reports or class discussions as long as their appear- ance is volunteered by the students and as long as the symbols are removed from display upon completion of the report or discussion.

D. PERFORMANCES, CEREMONIES, PROGRAMS AND GATHERINGS

1. School programs, assemblies or gatherings sponsored by the school shall not have a religious orientation. How- ever, seasonal programs presented by school student groups may include religious

music. Such programs shall include a balanced variety of music not solely of a religious nature.

2. The school district shall not conduct any baccalaureate service, nor shall it include religious invocations, benedictions or formal prayer at school sponsored events.

3. School musical groups may not participate, under the auspices of the school, in religious services.

E. WORSHIP/PRAYER

1. No form of prayer, worship or expression of belief shall be prescribed or sanctioned in fact, or in appearance, by the schools.

2. Refer to Equal Access Procedure/Policy 338.

F. PROSELYTIZING

1. In working with students, school district staff shall not proselytize or inject personal religious beliefs into any school related activities.

2. Unwelcome attempts by individuals or groups or students to impose religious beliefs or convert others to religious beliefs or to nonbelief are not permitted in school related activities.

3. The distribution of religious literature on school district property, unless directly related to instructional activities, is not permitted at any school related activities.

4. Non-student members of religious groups are not allowed in the school to proselytize or recruit during the school day or during school activities.

NOTE: CLUBS FORMED FOR RELIGIOUS PURPOSES
See Equal Access, Policy 338.

0903

**ATTACHMENT F**

