**FILED**
**United States Court of Appeals**
**Tenth Circuit**

**December 20, 2010**

**Elisabeth A. Shumaker**
**Clerk of Court**

**PUBLISH**

**UNITED STATES COURT OF APPEALS**

**FOR THE TENTH CIRCUIT**

---

AMERICAN ATHEISTS, INC, a
Texas non-profit corporation; R.
ANDREWS; S. CLARK; M. RIVERS,

      Plaintiffs - Appellants,

v.

LANCE DAVENPORT,
Superintendent, Utah Highway Patrol;
JOHN NJORD, Executive Director,
Utah Department of Transportation; F.
KEITH STEPAN, Director Division of
Facilities Construction and
Management Department of
Administrative Services,

      Defendants - Appellees,

and

UTAH HIGHWAY PATROL
ASSOCIATION,

      Defendant-Intervenor -
      Appellee,

------------------------------

THE UNITARIAN UNIVERSALIST
ASSOCIATION; THE UNION FOR
REFORM JUDAISM; THE SOCIETY
FOR HUMANISTIC JUDAISM; THE
INTERFAITH ALLIANCE; THE
HINDU FOUNDATION; THE

No. 08-4061
(D.C. No. 2:05-CV-00994-DS)
(D. Utah)

ANTI-DEFAMATION LEAGUE; EUGENE J. FISHER; AMERICANS UNITED FOR SEPARATION OF CHURCH AND STATE; AMERICAN HUMANIST ASSOCIATION; FOUNDATION FOR MORAL LAW; ROBERT E. MACKEY; THE AMERICAN LEGION; STATE OF COLORADO; STATE OF KANSAS; STATE OF NEW MEXICO; STATE OF OKLAHOMA; THE BECKET FUND FOR RELIGIOUS LIBERTY; GREGORY BELL; CURTIS BRAMBLE; ALLEN CHRISTENSEN; DAVID CLARK; MARGARET DAYTON; BRAD DEE; DAN EASTMAN; JOHN GREINER; WAYNE HARPER; JOHN HICKMAN; LYLE HILLYARD; SHELDON KILLPACK; PETER KNUDSON; MICHAEL MORLEY; WAYNE NIEDERHAUSER; HOWARD STEPHENSON; DENNIS STOWELL; AARON TILTON; JOHN VALENTINE; KEVIN VANTASSELL; CARLENE WALKER; CITY OF SANTA FE; UTAH SHERIFF'S ASSOCIATION,

Amici Curiae.

**ORDER**

Before **TACHA**[*], **KELLY**, **LUCERO**, **MURPHY**, **HARTZ**, **O'BRIEN**, **TYMKOVICH**, **GORSUCH**, and **HOLMES**, Circuit Judges.

---

This matter is before the court on defendants/appellees' *Petition For Rehearing With Suggestion For Rehearing En Banc*. Also before the court is the Utah Highway Patrol Association's *Petition For Rehearing En Banc*. We also have responses to both petitions from the plaintiffs/appellants.

Upon consideration, the requests for panel rehearing are granted in part. Specifically, the original panel opinion is amended at line 12 of page 29 replacing the word "universally" with the word "widely." In all other respects, the petition for panel rehearing is denied. A copy of the new panel opinion is attached to this Order.

Both suggestions for rehearing en banc were submitted to all of the judges of the court who are in regular active service and who are not recused in this matter. A poll was requested, and a majority voted to deny the en banc suggestion.

Judges Kelly, O'Brien, Tymkovich and Gorsuch would grant rehearing en banc. Judges Kelly and Gorsuch write separately, and those are attached to this order. Judge Kelly is joined by Judges O'Brien, Tymkovich, and Gorsuch, and

---

[*] Chief Judge Mary Beck Briscoe is recused in this matter and did not participate.

-3-

Judge Gorsuch is joined by Judge Kelly.

Entered for the Court,

*Elisabeth A. Shumaker*

ELISABETH A. SHUMAKER
Clerk of Court

-4-

No. 08-4061, <u>American Atheists, Inc. v. Duncan</u>.

**KELLY**, Circuit Judge, dissenting from the denial of rehearing en banc, with whom **O'BRIEN**, **TYMKOVICH**, and **GORSUCH**, Circuit Judges, join.

The court's decision continues a troubling development in our Establishment Clause cases—the use of a "reasonable observer" who is increasingly hostile to religious symbols in the public sphere and who parses relevant context and history to find governmental endorsement of religion. <u>See</u> <u>Am. Atheists, Inc. v. Duncan</u>, 616 F.3d 1145 (10th Cir. 2010). Despite assurance from the Supreme Court that the Establishment Clause does <u>not</u> require us to "purge from the public sphere all that in any way partakes in the religious," <u>Van Orden v. Perry</u>, 545 U.S. 677, 699 (2005) (Breyer, J., concurring) (citing <u>Marsh v. Chambers</u>, 463 U.S. 783 (1983)), the court's "reasonable observer" seems intent on doing just that. Thus, I respectfully dissent from the denial of rehearing en banc.

In striking down memorial crosses donated by the Utah Highway Patrol Association ("UHPA") to commemorate fallen troopers, the court erred in several respects. First, the court's analysis begins by effectively presuming that religious symbols on public property are unconstitutional. Such a presumption has no basis in our precedent and is unwarranted. Second, the court's reasonable observer does not sufficiently acknowledge the totality of the memorial crosses' physical appearance, not to mention their context and history. This selective observation leads to the nominally "reasonable" observer's odd conclusion that the UHP is a

sort of "Christian police" that favors Christians over non-Christians—a conclusion that has no support in the facts, and seems more based upon the additional facts contained in <u>Friedman v. Bd. of County Comm'rs of Bernalillo County</u>, 781 F.2d 777, 778, 782 (10th Cir. 1985) (en banc) than any sort of reality. Third, the court equates the religious nature of the cross with a message of endorsement. Contrary to the court's decision, the Defendants did not bear the impossible burden of proving that Latin crosses are secular symbols. Rather, they needed to show only that the memorial crosses at issue conveyed a message of memorialization, not endorsement.

Background

A brief recitation of the operative facts is necessary. In 1998 the Utah Highway Patrol Association, a private organization that supports Utah Highway Patrol ("UHP") officers and their families, began a project to memorialize UHP troopers killed in the line of duty. <u>Am. Atheists</u>, 616 F.3d at 1150. The UHPA decided to honor the fallen troopers by placing large, white crosses near the locations of their deaths. <u>Id.</u> at 1150-51. The UHPA chose crosses because in the UHPA's opinion, "only a white cross could effectively convey the simultaneous message[s] of death, honor, remembrance, gratitude, sacrifice, and safety." <u>Id.</u> at 1151 (internal quotation marks and citation omitted). The crosses are approximately twelve feet tall. <u>Id.</u> at 1150. The deceased officer's name and badge number are painted on the six-foot crossbar in large, black lettering. <u>Id.</u>

The crosses also bear the UHP's beehive symbol, the deceased trooper's picture, and a plaque containing the officer's biographical information. Id. The State of Utah permitted the UHPA to erect approximately thirteen crosses on public property, but explicitly stated that it "neither approves or disapproves the memorial marker[s]." Id. at 1151 (internal quotation marks omitted).

In striking down the memorial crosses under the Establishment Clause, the court employed Justice O'Connor's endorsement test. Am. Atheists, 616 F.3d at 1156-57. Under that framework, governmental action violates the Establishment Clause if, as viewed by a "reasonable observer," it has the "effect of communicating a message of government endorsement or disapproval of religion." Lynch v. Donnelly, 465 U.S. 668, 692 (1984) (O'Connor, J., concurring).

In my view, the court's application of the endorsement test is incorrect to the extent it: (1) effectively imposed a presumption of unconstitutionality on religious symbols in the public sphere; (2) employed a "reasonable observer" who ignored certain facts of the case and instead drew unsupported and quite odd conclusions; and (3) incorrectly focused on the religious nature of the crosses themselves, instead of the message they convey.

## Discussion

### A.     Presumption of Unconstitutionality.

The court's application of the "endorsement test" begins with the correct

and unremarkable observation that the Latin cross is "unequivocally a symbol of the Christian faith." Am. Atheists, 616 F.3d at 1160 (internal quotation marks and citation omitted). In the court's view, because the crosses are religious symbols standing alone, they "can only be allowed if their context and history avoid the conveyance of a message of governmental endorsement of religion." Id. Only after this initial determination does the court note—and promptly disregard—other physical features of the memorials, such as the officer's name and badge number, the photograph of the officer, and the plaque containing biographical information. Id. The court thus fails to grapple with these key contextual elements, instead treating them as facts insufficient to overcome the prior conclusion that the crosses endorse religion. See id. ("The fact that the cross includes biographical information about the fallen trooper *does not diminish the governmental message* endorsing Christianity.") (emphasis added); id. at 1161 ("Defendants point to four contextualizing facts that, they argue, *render these cross memorials sufficiently secular* to pass constitutional muster . . . .") (emphasis added).

This is a curious formulation of the issue. Of course, our job is to thoroughly analyze the appearance, context, and factual background of the challenged displays *before* deciding the constitutional question. See Lynch, 465 U.S. at 679-80; Cnty. of Allegheny v. ACLU, 492 U.S. 573, 598-600 (1989); Green v. Haskell Cnty. Bd. of Com'rs, 568 F.3d 784, 799-805 (10th Cir. 2009);

Weinbaum v. City of Las Cruces, 541 F.3d 1017, 1033-38 (10th Cir. 2008); O'Connor v. Washburn Univ., 416 F.3d 1216, 1227-31 (10th Cir. 2005). All of the cases cited above involve a display with at least some religious content. See Lynch, 465 U.S. 668 (crèche); Cnty. of Allegheny, 492 U.S. 573 (crèche and menorah); Green, 568 F.3d 784 (Ten Commandments display); Weinbaum, 541 F.3d 1017 (various displays of Latin crosses); O'Connor, 416 F.3d 1216 (caricature of a Catholic bishop). Indeed, at issue in Lynch and Allegheny were statues of Mary, Joseph, and Jesus—quintessentially religious symbols. Yet, the Supreme Court carefully considered all relevant factors to decide whether the displays conveyed a message of endorsement, not to "save" them from presumptive unconstitutionality. See Lynch, 465 U.S. at 679-80; Cnty. of Allegheny, 492 U.S. at 598-600. Further, in County of Allegheny the Supreme Court rejected Justice Stevens's view that religious symbols on public property are presumptively unconstitutional. See 492 U.S. at 650 (1989) (Stevens, J., dissenting). Likewise, in Green we expressly rejected a presumption of unconstitutionality for displays of the Ten Commandments on public property. See Green, 568 F.3d at 798 ("We reject at the outset Mr. Green's argument that governmental displays of the text of the Ten Commandments are presumptively unconstitutional.") (internal quotation marks and citation omitted).

Besides being unprecedented, the court's approach is unwarranted. While it is undoubtedly correct that governments cannot erect or maintain symbols that

convey "a message of governmental endorsement of religion," Am. Atheists, 616 F.3d at 1160, the converse is also true: governments *can* erect or maintain religious symbols that do *not* convey a message of endorsement. See, e.g., Lynch, 465 U.S. 668; Weinbaum, 541 F.3d 1017. Therefore, the mere presence of the memorial crosses, which are undoubtedly the "preeminent symbol of Christianity," Am. Atheists, 616 F.3d at 1160, tells us next to nothing. Without consulting all relevant factors, we simply cannot determine whether the challenged displays violate the Establishment Clause. To presume otherwise is to evince hostility towards religion, which the First Amendment unquestionably prohibits. See Lynch, 465 U.S. at 673. Thus, at the outset of this case the Defendants were not required to "secularize the message" of the memorial crosses. Am. Atheists, 616 F.3d at 1160. Rather, like in any other case, the Plaintiffs bore the initial burden of proof—here, showing that, given all the relevant context and history, the memorial crosses had the purpose or effect of endorsing religion.

B.     The Unreasonable "Reasonable Observer."

As the court notes, the "reasonable observer" of our Establishment Clause jurisprudence "is kin to the fictitious reasonably prudent person of tort law." Am. Atheists, 616 F.3d at 1158 (internal quotation marks and citation omitted). His knowledge is "not limited to the information gleaned simply from viewing the challenged display," and he "is presumed to know far more than most actual

members of a given community." Id. at 1158-59 (internal quotation marks and citations omitted). Additionally, a court's ultimate task is not to determine "whether there is *any* person who could find an endorsement of religion, whether *some* people may be offended by the display, or whether *some* reasonable person *might* think the State endorses religion." Capitol Square Review & Advisory Bd. v. Pinette, 515 U.S. 753, 780 (1995) (O'Connor, J., concurring) (internal quotation marks and citation omitted). Rather, the court must determine whether a fully informed, intelligent, and judicious "reasonable observer" would conclude that the display effectively sends a message that the government "prefer[s] one religion over another." Am. Atheists, 616 F.3d at 1156 (internal quotation marks and citations omitted).

In the Tenth Circuit, the extent of the reasonable observer's knowledge is vast. The reasonable observer is keenly aware of all the details of the challenged display, see Weinbaum, 541 F.3d at 1033-37; the display's physical setting, see Green, 568 F.3d at 805-06, O'Connor, 416 F.3d at 1228-29; the factual history surrounding the erection of the display, including the motives of the display's creator and the reasons for the display's design, see Green, 568 F.3d at 800-03, Weinbaum, 541 F.3d at 1037, O'Connor, 416 F.3d at 1228; the history of the relevant community and of the physical space occupied by the display, see Weinbaum, 541 F.3d at 1033-34, O'Connor, 416 F.3d at 1229; and other facts not typically available to the average passerby. See Green, 568 F.3d at 801

-7-

(statements of county commissioners with regard to a Ten Commandments display); id. at 802 (photographs of the county commissioners standing in front of the monument); Weinbaum, 541 F.3d at 1033-34 (explanatory brochure produced by the City); id. at 1034 n.18 (the fact that other American towns often incorporate symbols of the City's name in the City's seal); id. at 1037 (the "Olympic spirit" evoked by the display's Spanish slogan); O'Connor, 416 F.3d at 1228 (brochure explaining the campuses' art display).

Contrast this knowledge with the reasonable observer in this case: although the observer properly notices the crosses' large size and the UHP's beehive symbol, he fails to take account of the officer's name and badge number painted on the crossbar in large, black letters, the officer's picture, and the biographical plaque. Am. Atheists, 616 F.3d at 1160. Ostensibly this is because "a motorist driving by one of the memorial crosses at 55-plus miles per hour may not notice, and certainly would not focus on, the biographical information." Id. However, the court itself noted that the reasonable observer's knowledge is "not limited to the information gleaned simply from viewing the challenged display." Id. at 1158 (internal quotation marks and citation omitted). This implies that the reasonable observer, at the very least, must "view[] the display itself." Id. (internal quotation marks and citation omitted). That the average member of the community may not make the effort to familiarize themselves with the crosses does not matter—"the reasonable observer is presumed to know far more than

-8-

most actual members of a given community." <u>Id.</u> at 1159 (internal quotation marks and citation omitted).

Beyond failing to acknowledge the entirety of the crosses' physical characteristics, the court's reasonable observer fails to adequately address the obvious and critical facts surrounding the memorial crosses—the crosses are erected near the location of the officer's death, the crosses were erected by a private organization for the purpose of memorializing the fallen trooper, the crosses were chosen by the trooper's family, and that Utah expressly declined to endorse the memorials. <u>Am. Atheists</u>, 616 F.3d at 1150-51. Failing to consider the relevant factual background stands in stark contrast to our precedent. In <u>Green</u>, for example, the reasonable observer considered the donor's ostensible religious motivations for approaching the Board of County Commissioners, the Board's decision timeline, and the Commissioner's subsequent actions in support of the display. <u>Green</u>, 568 F.3d at 800-01. Similarly, in <u>Weinbaum</u> the reasonable observer knew that schoolchildren, not the school district, designed the challenged mural, <u>Weinbaum</u>, 541 F.3d at 1037, and in <u>O'Connor</u> the reasonable observer considered prior displays that had been erected in the same location. <u>O'Connor</u>, 416 F.3d at 1228. Yet in this case the court's "reasonable observer" fails to consider nearly all the facts that cut against finding governmental endorsement.

The court's "reasonable observer" does not merely fail to consider all

-9-

relevant facts. He quickly departs from the evidence presented by the parties in favor of an unfounded and somewhat paranoid theory. Instead of concluding that the UHP adopted the crosses to memorialize the trooper whose name, picture, and biographical information is affixed to the cross—which, of course, is the conclusion supported by the record—the court's observer "link[s]" the UHP and Christianity by way of the UHP's beehive symbol. Am. Atheists, 616 F.3d at 1160. This "link" then leads the observer to conclude that the UHP is a sort of "Christian police" that discriminates in enforcing the law and hiring new employees. Id. at 1160-61. But why would a reasonable observer conjure up fears of religious discrimination given the far more plausible conclusion supported by the facts on the record—that the crosses memorialize fallen troopers? After all, a display's "[e]ffects are most often the manifestations of a motivating purpose." Weinbaum, 541 F.3d at 1033. Deciding an Establishment Clause case in part upon unfounded fears of discrimination, a sort of conspiratorial view of life, is an unwise approach. Things are often no more than what they appear. Yet, once unmoored from the facts of the case the reasonable observer's conclusion is limited only by the court's ability to imagine scenarios that *would*, if true, violate the Constitution.

The Court cites Friedman v. Board of Cnty. Comm'rs to support the reasonable observer's fear of discrimination. However, contrary to the decision in Friedman, where the County's seal, which was affixed to law enforcement

-10-

vehicles, bore a cross surrounded by a "blaze of golden light," a flock of sheep, and a Spanish phrase that translated to "With this, we conquer," 781 F.3d 777, 779 (10th Cir. 1985), in this case the observer's fear of discrimination is completely conjectural.

In support of the decision, the court repeatedly emphasizes the crosses' size. Am. Atheists, 616 F.3d at 1161, 1162, 1163 n.14. It is true that the twelve-foot memorials are considerably taller than most roadside crosses. However, the UHPA's explanation for the size is quite sensible: to ensure that passing motorists will take notice of the display and absorb its message of "death, honor, remembrance, gratitude, sacrifice, and safety." Id. at 1151.

Further, would the court's "reasonable" observer be satisfied if the crosses were smaller? Not likely. After all, both small and large crosses are the "preeminent symbol[s] of Christianity," id. at 1160, and it would be difficult for the UHPA to cram all the "contextualizing facts" the court desires onto a small cross. Focusing on the crosses' size also exacerbates an already acute problem in our Establishment Clause jurisprudence—providing governments and the public with notice of what actions violate the Constitution. If a twelve-foot cross is unconstitutional, how about eight feet? Six feet? Four? Two? And what is the guiding principle? Confronted with the court's decision, governments face a Hobson's choice: foregoing memorial crosses or facing litigation. The choice most cash-strapped governments would choose is obvious, and it amounts to a

-11-

heckler's veto. Some might greet that result with enthusiasm—but it is certainly not required by the Constitution.

The court also notes that, in briefing and in oral argument, Utah took the position that it would permit memorial crosses but not other religious symbols. Am. Atheists, 616 F.3d at 1152 n.2. Admittedly, Utah permitting only one religious symbol should give us pause in the appropriate case—but this is not the appropriate case. We really do not know how Utah officials would react if the UHPA requested permission to erect a symbol other than a cross, or how they would justify their decision. However, we do know the facts of this case. Here, the evidence shows that every family agreed to a cross. Id. at 1151. Thus, our role is not to postulate on the issue of whether Utah would send a message of endorsement if it permitted only crosses as memorials for deceased troopers.

C.     Religious Symbolism of the Memorial Crosses.

Throughout the opinion, the court implies that the memorial crosses cannot simultaneously be religious symbols and survive challenge under the Establishment Clause. See Am. Atheists, 616 F.3d at 1161 ("We agree that a reasonable observer would recognize these memorial crosses as symbols of death. However, we do not agree that this nullifies their religious sectarian content because a memorial cross is not a *generic* symbol of death; it is a *Christian* symbol of death that signifies or memorializes the death of a *Christian*."); id. ("[T]here is no evidence that [the cross] is widely accepted as a secular

-12-

symbol."); id. at 1162 ("[T]he mere fact that the cross is a *common* symbol . . . does not mean it is a *secular* symbol.").

These statements are both confusing and troubling. Just as the Establishment Clause does not "compel the government to purge from the public sphere all that in any way partakes in the religious," Van Orden, 545 U.S. at 699 (Breyer, J., concurring) (citation omitted), it does not require the government to strip religious symbols of all religious significance as a condition precedent for display on public property. The court distinguishes this case from those addressing display of Christmas trees on the basis that Christmas trees have become secular symbols. See Am. Atheists, 616 F.3d at 1161. But the Supreme Court's decision addressing crèches are more on point. See Lynch, 465 U.S. at 671 (upholding a crèche displayed in a public park). Lynch did not hold that the statutes of Mary, Joseph, and Jesus had somehow morphed into secular symbols. Their religious nature was not stripped by the surrounding reindeer. Id. at 687. Rather, the Court held that these admittedly *religious* symbols did not violate the Establishment Clause. Id. at 685; see also id. at 692 (O'Connor, J., concurring) (applying the endorsement test to conclude that, despite the "religious and indeed sectarian significance of the crèche," the display did not endorse religion).

Likewise, in this case the Defendants did not face the impossible task of producing evidence "that the cross has been universally embraced as a marker for the burial sites of non-Christians or as a memorial for a non-Christian's death."

-13-

American Atheists, 616 F.3d at 1161. They did not bear the burden of proving that the cross "is widely accepted as a secular symbol." Id. That the cross is a "*Christian* symbol of death that signifies or memorializes the death of a *Christian*" is not fatal under the Establishment Clause. Id. Rather, the Defendants needed to prove only that the memorial crosses—which are clearly religious symbols—did not send the message that Utah endorses Christianity.

The court also concludes that the crosses did not "convey[] in this context a secular meaning that can be divorced from its religious significance." Id. at 1162. The court's inability to ascertain a nonreligious message is remarkable. Recently, a plurality of the Supreme Court recognized precisely what the court did not—that the white, Latin cross is a "symbol that . . . has complex meaning beyond the expression of religious views." Salazar v. Buono, 130 S. Ct. 1803, 1818 (2010) (plurality opinion). Indeed, Justice Kennedy recognized that "a Latin cross is not merely a reaffirmation of Christian beliefs. It is a symbol often used to honor and respect those whose heroic acts, noble contributions, and patient striving help secure an honored place in history for this Nation and its people." Id. at 1820. Because crosses send at least a two-fold message, the plurality stated that "[a] cross by the side of a public highway marking, for instance, the place where a state trooper perished need not be taken as a statement of governmental support for sectarian beliefs." Id. at 1818. The court in the case at bar instead takes the view of the three dissenting justices—that crosses send a primarily religious

-14-

message.  Id. at 1829 (Stevens, J., dissenting).

While Buono does not directly control the case before us, the plurality's opinion supports the common-sense perception that the memorial crosses did indeed have a "secular meaning that [could] be divorced from their religious significance."  Am. Atheists, 616 F.3d at 1162.  This "secular meaning" or "secular message" is clear: to memorialize troopers who were killed in the line of duty.  This is the message supported by the facts in the record, and it is a message fully consistent with the Constitution's Establishment Clause.

No. 08-4061, *American Atheists, Inc. v. Duncan*

**GORSUCH**, Circuit Judge, joined by **KELLY**, Circuit Judge, dissenting from the denial of rehearing en banc.

I respectfully dissent from denial of rehearing *en banc*. Judge Kelly outlines several reasons why this decision is worthy of the full court's attention. I write to note two more.

I

Our court has now *repeatedly* misapplied the "reasonable observer" test, and it is apparently destined to continue doing so until we are told to stop. Justice O'Connor instructed that the reasonable observer should not be seen as "any ordinary individual, who might occasionally do unreasonable things, but . . . rather [as] a personification of a community ideal of reasonable behavior." *Capitol Square Review and Advisory Bd. v. Pinette*, 515 U.S. 753, 779-80 (1995) (O'Connor, J., concurring) (internal quotations omitted). Yet, our observer continues to be biased, replete with foibles, and prone to mistake.

In this case, our observer starts with the biased presumption that Utah's roadside crosses are unconstitutional. Panel Op. at 25-26. He does so despite the fact a plurality of the Supreme Court only this year held that "[a] cross by the side of a public highway marking, for instance, the place where a state trooper perished need not be taken as a statement of governmental support for sectarian beliefs." *Salazar v. Buono*, 130 S. Ct. 1803, 1818 (2010) (plurality op.). Our observer takes no heed of this direction. And when he looks to see whether he

might overcome his initial bias, the task proves impossible because he disregards the very secularizing details — such as the fallen trooper's name inscribed on the crossbar — that might allow him to change his mind. He misses these integral components of the display, we're told, because "a motorist driving by one of the memorial crosses at 55-plus miles per hour may not notice, and certainly would not focus on, the biographical information." Panel Op. at 27. So it is that we must now apparently account for the speed at which our observer likely travels and how much attention he tends to pay to what he sees. We can't be sure he will even bother to stop and look at a monument before having us declare the state policy permitting it unconstitutional.

But that's not the end of things. It seems we must also take account of our observer's selective and feeble eyesight. Selective because our observer has no problem seeing the Utah highway patrol insignia and using it to assume some nefarious state endorsement of religion is going on; yet, mysteriously, he claims the inability to see the fallen trooper's name posted directly above the insignia. *Id.* at 26-27.



And feeble because our observer can't see the trooper's name even though it is painted in approximately 8-inch lettering across a 6-foot cross-bar — the same size text used for posting the words "SPEED LIMIT" alongside major interstate highways. *See* Federal Highway Administration, Manual on Uniform Traffic Control Devices for Streets and Highways 46 (2009); Federal Highway Administration, Standard Highway Signs 1-10 (2004). What's more, many of Utah's memorials aren't even on highways: four of the thirteen are adjacent to side-streets where "55-plus" speeds aren't common — including two in front of a Utah Highway Patrol field office. All the same, our observer plows by, some combination of too blind and too fast to read signs adequate for interstate

highway traffic.  Biased, selective, vision impaired, and a bit of a hot-rodder our observer may be, but the reasonable observer of Justice O'Connor's description he is not.

Still, if this case could be dismissed as a "one off" misapplication of the reasonable observer test, that might make it less worthy of review.  But it can't be so easily shrugged off.  Two years ago we applied a similar misconstruction of the reasonable observer test to become the only circuit court since the Supreme Court's decision in *Van Orden v. Perry*, 545 U.S. 677 (2005), to order the removal of a Ten Commandments display that was admittedly erected without a religious purpose and in the context only of a larger secular historical presentation.  *See Green v. Haskell Cnty. Bd. of Commr's*, 574 F.3d 1235, 1248-49 (10th Cir. 2009) (Gorsuch, J., dissenting).  There, like here, we did so only by employing an observer full of foibles and misinformation.  *See id.* at 1246-58.  Now we become the only circuit since *Van Orden* to order the removal of memorial highway crosses to fallen public servants, using this same strikingly unreasonable observer who bears none of the traits Justice O'Connor described.  Thus, the pattern is clear:  we will strike down laws other courts would uphold, and do so whenever a reasonably biased, impaired, and distracted viewer might *confuse* them for an endorsement of religion.

And this raises an even larger question. The court's holding does and must rest on the view that anything a putatively "reasonable observer" could think "endorses" religion is constitutionally problematic. Indeed, the result in this case could hardly be achieved under any different test. It is undisputed that the state actors here did *not* act with any religious purpose; there is *no* suggestion in this case that Utah's monuments establish a religion or coerce anyone to participate in any religious exercise; and the court does not even render a judgment that *it thinks* Utah's memorials *actually* endorse religion. Most Utahans, the record shows, don't even revere the cross. Thus it is that the court strikes down Utah's policy *only* because it is able to imagine a hypothetical "reasonable observer" who *could think* Utah means to endorse religion — even when it doesn't.

But whether even the true reasonable observer/endorsement test remains appropriate for assessing Establishment Clause challenges is far from clear. A majority of the Supreme Court in *Van Orden* declined to employ the reasonable observer/endorsement test in an Establishment Clause challenge to a public display including the Ten Commandments. *See* 545 U.S. at 687 (Rehnquist, J.); *id.* at 700 (Breyer, J., concurring). Following the Supreme Court's cue, at least three of our sister circuits seem to have rejected the test, at least when it comes to passive public displays like Utah's. *See ACLU Nebraska Found. v. City of Plattsmouth, Neb.*, 419 F.3d 772, 778 & n.8 (8th Cir. 2005); *Card v. City of*

*Everett*, 520 F.3d 1009, 1018 (9th Cir. 2008); *Myers v. Loudoun Cnty. Pub. Schs.*, 418 F.3d 395, 402 (4th Cir. 2005). And this year a plurality of the Supreme Court questioned whether even the true "reasonable observer" framework is always appropriate for analyzing Establishment Clause questions. *See Buono*, 130 S. Ct. at 1819.

The court today, however, declines to consider any of these developments, much as it declined to do so in *Green*. *See* 574 F.3d at 1245 (Gorsuch, J., dissenting). So it is that our opinions in this field continue to apply (or misapply) a reasonable observer/endorsement test that has come under much recent scrutiny — and, worse, our opinions do so without stopping to acknowledge, let alone grapple with, the questions others have raised about the test. It is a rare thing for this court to perpetuate a circuit split without giving due consideration to, or even acknowledging, the competing views of other courts or recent direction from the High Court. But that's the path we have taken.

Neither is this any humdrum disagreement where uniformity of federal law may not be a pressing concern. Where other courts permit state laws and actions to stand, we strike them down. And the test we use to do so rests on an uncertain premise — that this court possesses the constitutional authority to invalidate not only duly enacted laws and policies that *actually* "respect[] the establishment of religion," U.S. Const. amend. I, but also laws and policies a reasonable hypothetical observer could *think* do so. And, in this circuit's case, to go even a

-6-

step further still, claiming the authority to strike down laws and policies a conjured observer could *mistakenly* think respect an establishment of religion. That is a remarkable use of the "awesome power" of judicial review, *Williams v. United States*, 401 U.S. 667, 678 (1971) (Harlan, J., concurring in part and dissenting in part); *cf. Capitol Square Review and Advisory Bd. v. Pinette*, 515 U.S. 753, 768 (1995) (plurality op.), and it would have been well worth our while at least to pause to consider its propriety before rolling on.

FILED
United States Court of Appeals
Tenth Circuit

December 20, 2010

Elisabeth A. Shumaker
Clerk of Court

**PUBLISH**

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

---

AMERICAN ATHEISTS, INC., a
Texas non-profit corporation;
R. ANDREWS; S. CLARK; and
M. RIVERS,

      Plaintiffs-Appellants,

v.

SCOTT T. DUNCAN, Colonel,
Superintendent of Utah Highway
Patrol; LANCE DAVENPORT,
Superintendent, Utah Highway Patrol,
in his official capacity; JOHN
NJORD, Executive Director, Utah
Department of Transportation; and F.
KEITH STEPAN, Director Division of
Facilities Construction and
Management Department of
Administrative Services,

      Defendants-Appellees,

and

UTAH HIGHWAY PATROL
ASSOCIATION,

      Defendant-Intervenor-Appellee.
_____

THE UNITARIAN UNIVERSALIST
ASSOCIATION; THE UNION FOR
REFORM JUDAISM; THE SOCIETY

No. 08-4061

FOR HUMANISTIC JUDAISM; THE
INTERFAITH ALLIANCE; THE
HINDU AMERICAN FOUNDATION;
THE ANTI-DEFAMATION LEAGUE;
EUGENE J. FISHER; AMERICANS
UNITED FOR SEPARATION OF
CHURCH AND STATE; AMERICAN
HUMANIST ASSOCIATION;
FOUNDATION FOR MORAL LAW;
ROBERT E. MACKEY; THE
AMERICAN LEGION; STATE OF
COLORADO; STATE OF KANSAS;
STATE OF NEW MEXICO; STATE
OF OKLAHOMA; THE BECKET
FUND FOR RELIGIOUS LIBERTY;
GREGORY BELL; CURTIS
BRAMBLE; ALLEN CHRISTENSEN;
DAVID CLARK; MARGARET
DAYTON; BRAD DEE; DAN
EASTMAN; JOHN GREINER;
WAYNE HARPER; JOHN
HICKMAN; LYLE HILLYARD;
SHELDON KILLPACK; PETER
KNUDSON; MICHAEL MORLEY;
WAYNE NIEDERHAUSER;
HOWARD STEPHENSON; DENNIS
STOWELL; AARON TILTON; JOHN
VALENTINE; KEVIN
VANTASSELL; CARLENE
WALKER; CITY OF SANTA FE;
UTAH SHERIFFS' ASSOCIATION,

Amici Curiae.

**Appeal from the United States District Court
for the District of Utah
(D.C. No. 2:05-CV-00994-DS)**

Brian M. Barnard of Utah Civil Rights & Liberties Foundation, Inc., Salt Lake City, Utah, for Plaintiffs-Appellants.

Thom D. Roberts, Assistant Utah Attorney General (Mark L. Shurtleff, Attorney General, with him on brief), Salt Lake City, Utah, for Defendants-Appellees.

Byron J. Babione of Alliance Defense Fund (Benjamin W. Bull and David R. Sheasby of Alliance Defense Fund, Scottsdale, Arizona, Frank D. Mylar of Mylar Law P.C., Cottonwood Heights, Utah, and Steven Fitschen of The National Legal Foundation, Virginia Beach, Virginia, with him on brief), Scottsdale, Arizona, for Defendant-Intervenor-Appellee.

Luke W. Goodrich of The Becket Fund for Religious Liberty, Washington, D.C. (Eric C. Rassbach of The Becket Fund for Religious Liberty, Washington, D.C., Steve Six, Attorney General, Topeka, Kansas, Gary K. King, Attorney General, Santa Fe, New Mexico, W.A. Drew Edmondson, Attorney General, Oklahoma City, Oklahoma, John W. Suthers, Attorney General, Denver, Colorado, Daniel D. Domenico, Solicitor General, Denver, Colorado, and Geoffrey N. Blue, Deputy Attorney General, Denver, Colorado, with him on the brief) for Amici Curiae, the States of Colorado, Kansas, New Mexico, and Oklahoma, and The Becket Fund for Religious Liberty, in support of Defendants-Appellees.

Robert V. Ritter of Appignani Humanist Legal Center, American Humanist Association, Washington, D.C., filed an amici curiae brief for American Humanist Association, Society for Humanistic Judaism, and Unitarian Universalist Association, in support of Plaintiffs-Appellants.

Evan M. Tager and David M. Gossett of Mayer Brown LLP, Washington, D.C., and Brian M. Willen of Mayer Brown LLP, New York, New York, Steven M. Freeman, Steven C. Sheinberg, and Michelle N. Deutchman of Anti-Defamation League, New York, New York, Mark J. Pelavin of Union for Reform Judaism, Washington, D.C., Ayesha N. Khan and Richard B. Katskee of Americans United for Separation of Church and State, Washington, D.C., and Suhag A. Shukla of Hindu American Foundation, Kensington, Maryland, filed an amici curiae brief for Americans United for Separation of Church and State, The Anti-Defamation League, The Hindu American Foundation, The Interfaith Alliance, The Union for Reform Judaism, and Dr. Eugene Fisher, in support of Plaintiffs-Appellants.

Roy S. Moore, John A. Eidsmoe, and Benjamin D. DuPrè for Foundation for Moral Law, Montgomery, Alabama, filed an amicus curiae brief for Foundation for Moral Law, in support of Defendants-Appellees.

Michael A. Sink of Perkins Coie LLP, Denver, Colorado, filed an amicus curiae brief for Robert E. Mackey, in support of Defendants-Appellees.

John Ansbro of Orrick, Herrington, & Sutcliffe LLP, New York, New York, filed an amicus curiae brief for The American Legion, in support of Defendants-Appellees.

Chad N. Boudreaux and Adam J. White of Baker Botts, LLP, Washington, D.C., filed an amici curiae brief on behalf of Gregory Bell, Curtis Bramble, Allen Christensen, David Clark, Margaret Dayton, Brad Dee, Dan Eastman, John Greiner, Wayne Harper, John Hickman, Lyle Hillyard, Sheldon Killpack, Peter Knudson, Michael Morley, Wayne Niederhauser, Howard Stephenson, Dennis Stowell, Aaron Tilton, John Valentine, Kevin VanTassell and Carlene Walker (collectively "Utah Legislators") and City of Santa Fe, in support of Defendants-Appellees.

Kevin T. Snider of Pacific Justice Institute, Sacramento, California, filed an amicus curiae brief for Utah Sheriffs' Association, in support of Defendants-Appellees.

_____

Before **TACHA, EBEL,** and **HARTZ**, Circuit Judges.

_____

**EBEL**, Circuit Judge.

_____

The Utah Highway Patrol Association ("UHPA"), with the permission of Utah state authorities, erected a number of twelve-foot high crosses on public land to memorialize fallen Utah Highway Patrol ("UHP") troopers. Plaintiffs-Appellants, American Atheists, Inc., a Texas non-profit organization, and three individual members of American Atheists who reside in Utah, challenge the legality of these memorials under the Establishment Clause of the federal constitution and Article I of Utah's constitution. We hold that these memorials

-4-

have the impermissible effect of conveying to the reasonable observer the message that the State prefers or otherwise endorses a certain religion. They therefore violate the Establishment Clause of the federal constitution. In light of this conclusion, we need not reach the separate question of whether these displays also violate Utah's constitution.

## I.    Background

UHPA, a non-profit organization that supports UHP officers and their families, initiated the memorial project in 1998. The memorials are twelve-foot high crosses with six-foot horizontal cross-bars. The fallen trooper's name, rank, and badge number are printed in large letters on the horizontal cross-bar. Immediately underneath the place where the two bars meet hangs a large (approximately 12" high and 16" wide) depiction of the UHP's official "beehive" symbol. Beneath that are printed the year the trooper died and a small plaque containing a picture of the trooper and some biographical information.[1]

UHPA member and officer Lee Perry and his friend Robert Kirby came up with the idea for these memorials and designed the crosses, which UHPA approved. UHPA asserts that

> [t]he purpose of these memorials is fourfold: (1) the memorials stand as a lasting reminder to UHPA members and Utah highway patrol troopers that a fellow trooper gave his life in service to this state; (2) the memorials remind highway drivers that a trooper died in order to make the state safe for all citizens; (3) the memorials honor the trooper and

---

[1]Photos of some of these displays are attached to this opinion.

the sacrifice he and his family made for the State of Utah; and (4) encourage safe conduct on the highways.

(Aple. Supp. App. at 3112.)  Perry and Kirby determined that "only a cross could effectively convey these weighty messages instantaneously" to motorists driving by a memorial.  (Id. at 3165.)  According to Perry, they chose a white Roman or Latin cross because

> only a white cross could effectively convey the simultaneous messages of death, honor, remembrance, gratitude, sacrifice, and safety.  I determined this because a cross is widely recognized as a memorial for a person's death and especially respect to those who have given their lives to insure the safety and protection of others.

(Aplt. App. at 420.)  Moreover, a "cross, near the highway, with the inscriptions, symbols and plaques mentioned above, conveys the unmistakable message that a Utah Highway Patrolman died near this spot while serving the people of Utah." (Id. at 423.)

Because generally drivers would be passing a memorial at 55-plus miles per hour, the UHPA determined that the cross memorials "needed to prominently communicate all of this instantaneously."  (Aple. Supp. App. at 3165.)  Further, to "effectively communicate these messages," the UHPA sought "to place each cross in a location that was: (1) visible to the public; (2) safe to stop and view; and (3) as close to the actual spot of the trooper's death as possible."  (Id.)

Before erecting any memorial, the UHPA obtained the consent of the fallen trooper's family.  None of these families have ever objected to the use of the

-6-

cross as a memorial or requested that the UHPA memorialize their loved one using a different symbol. However, "[b]ecause [the UHPA] exist[s] to serve family members of highway patrolmen, the UHPA would provide another memorial symbol if requested by the family."[2] (Aplt. App. at 1869.)

UHPA erected its first memorial cross in 1998 on private property located approximately fifty feet from a state highway. Later, UHPA obtained permission from the State of Utah to erect additional memorial crosses on public property, including the rights-of-way adjacent to the State's roads, roadside rest areas, and the lawn outside a UHP office in Salt Lake County.[3] In permitting the memorials, however, the State has, on at least one occasion, expressly noted that it "neither approves or disapproves the memorial marker." (Id. at 2303.)

Between 1998 and 2003, the UHPA erected a total of thirteen memorials. The memorials are all privately funded; UHPA retains ownership of the memorials and maintains them, while the State continues to own and control the state land on which some of the memorials are located. Local businesses and Boy Scout troops have aided the UHPA in funding, building and maintaining the

---

[2]Notwithstanding the UHPA's position, the State Defendants, in oral argument before the district court and in their briefs and argument before us, asserted that they would not allow any change in the memorial, whether to accommodate other faiths or otherwise.

[3]A photo depicting the lawn outside this UHP office, where all of one and part of the other of these two memorial crosses are visible, is attached to this opinion.

memorial crosses.

## II.    This litigation

Plaintiffs brought this suit under 42 U.S.C. § 1983 and Article I of the Utah Constitution against several state employees who were responsible for authorizing the UHPA to incorporate the UHP logo on the memorial crosses and to place of some of these crosses on state land.[4]  Although Plaintiffs initially alleged violations of both the establishment and "free expression" clauses of these constitutions, Plaintiffs later dismissed their "free expression" claims.  Based upon the alleged establishment clause violations, Plaintiffs seek, as relief, $1 in nominal damages, an injunction ordering the removal of these memorial crosses from state property, an injunction ordering that the UHP insignia be removed from all UHPA memorial crosses, a declaration that these memorial crosses' presence on state property violates Plaintiffs' constitutional rights, a declaration that it is a constitutional violation to allow the UHP insignia to be placed on these memorial crosses, and attorneys' fees.  The district court allowed UHPA to intervene as a party-defendant.

Upon the parties' cross-motions for summary judgment, the district court denied Plaintiffs' motions and granted summary judgment for all Defendants,

---

[4]UHPA asserts that federal courts do not have subject matter jurisdiction to consider Establishment Clause claims asserted under 42 U.S.C. § 1983.  This court, however, has previously rejected that argument.  See Green v. Haskell County Bd. of Comm'rs, 568 F.3d 784, 788 n.1 (10th Cir. 2009), cert. denied, 130 S. Ct. 1687 (2010).

holding that these memorial crosses did not violate the federal or state

constitution.  See American Atheists, Inc. v. Duncan, 528 F. Supp. 2d 1245 (D.

Utah 2007).  Plaintiffs timely appealed that decision.  We have jurisdiction to

consider this appeal pursuant to 28 U.S.C. § 1291.[5]  See Green, 568 F.3d at 788.

**III.  Analysis**

A.    Standing

As a threshold matter, we must determine whether Plaintiffs have Article

III standing to bring this case.  See O'Connor v. Washburn Univ., 416 F.3d 1216,

1222 (10th Cir. 2005).  The district court held that Plaintiffs had standing because

they "have experienced direct and unwelcome contact with the memorial crosses

at issue in this case . . . . [and] would have to alter their commutes in order to

avoid contact with the memorials."  American Atheists, 528 F. Supp. 2d at 1251.

---

[5]This court delayed issuing this opinion, awaiting the Supreme Court's decision in Salazar v. Buono, 130 S. Ct. 1803 (2010).  Buono initially involved an Establishment Clause challenge to private citizens' erecting a white cross on federal land as a war memorial.  See id. at 1811-12.  The Ninth Circuit held that violated the Establishment Clause, a decision the defendants did not appeal.  See id. at 1812-13.  The Supreme Court, thus, did not address the merits of the Establishment Clause claim, but instead addressed a later procedural development, considering, instead, the plaintiff's attempt to enforce the judgment he obtained against the display of the cross on public land, in light of the government's subsequent transfer of the land at issue to private concerns.  See id. at 1811-13, 1815-16 (Kennedy, J., joined by Roberts, C.J., and Alito, J); id. at 1824-25 (Scalia, J, joined by Thomas, J., concurring in the judgment); id. at 1828 (Stevens, J, joined by Ginsburg and Sotomayor, J., dissenting); id. at 1842-43 (Breyer, J., dissenting).  The Court upheld the land transfer against the plaintiff's challenge.  See id. at 1811 (Kennedy, J., joined by Roberts, C.J., and Alito, J); id. at 1824-25 (Scalia, J, joined by Thomas, J., concurring in the judgment).

"We review the question of whether a plaintiff has constitutional standing de novo." Green, 568 F.3d at 792.

"To demonstrate standing, a plaintiff must allege actual or threatened personal injury, fairly traceable to the defendant's unlawful conduct and likely to be redressed by a favorable decision of the court." Foremaster v. City of St. George, 882 F.2d 1485, 1487 (10th Cir. 1989). In Establishment Clause cases, "[a]llegations of personal contact with a state-sponsored image suffice to demonstrate this kind of direct injury." O'Connor, 416 F.3d at 1223.

Here, the individual named plaintiffs allege to have had "direct personal and unwelcome contact with the crosses." (Aplt. App. at 587, 596, and 682.) Under O'Connor, 416 F.3d at 1223, these allegations establish standing. See also Weinbaum v. City of Las Cruces, 541 F.3d 1017, 1028-29 (10th Cir. 2008). Mr. Andrews, one of the named plaintiffs, also stated that he has "occasionally altered [his] travel route or [has] not stopped at a particular rest stop to avoid contact with the crosses." (Aplt. App. at 596.) Mr. Andrews's allegation that he was "forced to alter [his] behavior to avoid contact with the display, although not necessary for standing, further support[s] this conclusion." O'Connor, 416 F.3d at 1223. "Moreover, the Plaintiffs-Appellants' alleged injuries stem directly from the conduct of the [State]. . . . Lastly . . . a favorable judgment from the federal court would redress the injuries. As such, the Plaintiffs-Appellants have standing to pursue [this case] before this court." Weinbaum, 541 F.3d at 1028-29.

Because the individual named plaintiffs here have standing, this court does not need to determine whether American Atheists would also have standing in its own right. See Watt v. Energy Action Educ. Found., 454 U.S. 151, 160 (1981) (determining that because one of the plaintiffs "has standing, we do not consider the standing of the other plaintiffs"); see also Green, 568 F.3d at 793 n.5 ("Because we conclude that [Plaintiff-Appellant] Mr. Green has standing, . . . it is unnecessary to address the ACLU of Oklahoma's standing.").

B.     Whether the district court abused its discretion in striking the declarations of O. Salah and D. Chatterjee

The district court ordered the parties, when submitting declarations, to identify which motion those declarations supported. The court further warned the parties that "[f]ailure to identify the declarations in this manner will result in their being stricken and not considered by the court." (D. Ct. doc. 132.) Subsequent to the district court's order, Plaintiffs submitted to the court the declarations of O. Salah and D. Chatterjee, but failed to identify the motion Plaintiffs sought to support with those declarations. The district court, therefore, struck them. The court did not abuse its discretion in doing so.[6] See Jones v. Barnhart, 349 F.3d

---

[6]In striking these declarations, the district court also noted that D. Chatterjee's declaration appears to be an attempt by Plaintiffs "to submit expert testimony under the guise of lay opinion testimony. The Chatterjee declaration is inadmissible because he was never identified as an expert and his testimony does not fit any other admissible category." (Aplt. App. at 2904-05.) We need not address the propriety of this additional reason for striking Chatterjee's declaration because the district court was justified in striking both declarations due to

(continued...)

-11-

1260, 1270 (10th Cir. 2003) (reviewing decision regarding motion to strike for an abuse of discretion).

C.     Whether the Free Speech Clause Protects these Cross Memorials from Establishment Clause Scrutiny

As an initial matter, UHPA argues that the displays at issue in this case are UHPA's private speech, not the expression of the state of Utah and, therefore, that the Free Speech Clause, not the Establishment Clause, should govern our analysis in this case.  Further, UHPA asserts that Utah would violate the Free Speech Clause by prohibiting the displays at issue in this case and, therefore, that the Establishment Clause cannot mandate the prohibition of these displays.  The UHPA is supported in this position by amici curiae, the States of Colorado, Kansas, New Mexico, and Oklahoma, and The Becket Fund for Religious Liberty. These arguments fail in light of the Supreme Court's recent decision in Pleasant Grove City v. Summum, 129 S. Ct. 1125 (2009).

In Pleasant Grove City, the Supreme Court held that "[j]ust as government-commissioned and government-financed monuments speak for the government, so do privately financed and donated monuments that the government accepts and displays to the public on government land." Id. at 1133.  Thus, the Court concluded, "as a general matter, [the Free Speech Clause's] forum analysis simply

_____

[6](...continued)
Plaintiffs' failure to identify which motions these declarations were intended to support.

does not apply to the installation of permanent monuments on public property."
Id. at 1138.

As permanent monuments erected on public land,[7] the cross memorials at issue in this case fall squarely within the rule pronounced by the Court in Pleasant Grove City and, therefore, must be analyzed not as private speech, but as government speech—the scope and content of which is restrained, inter alia, by the Establishment Clause. See id. at 1131-32; see also Green, 568 F.3d at 797 n.8.

Both at oral argument and in a letter submitted pursuant to Fed. R. App. P. 28 (j), the state amici and the Becket Fund for Religious Liberty attempt to distinguish this case from Pleasant Grove City, arguing that even in light of the Court's opinion in Pleasant Grove City, the displays at issue in this case should be treated as private speech. They argue that Pleasant Grove City can be distinguished from our case in three ways: (1) in Pleasant Grove City, the city took ownership of the displays at issue, while in this case, the UHPA has retained ownership of the memorial crosses; (2) Utah has distanced itself from the message conveyed in these displays by issuing a statement that the Utah Department of Transportation "neither approves or disapproves the memorial marker" (Aplt. App. at 2303); and (3) unlike the displays at issue in Pleasant Grove City, these

---

[7]Although it appears that at least one memorial is located on private land, the UHPA does not base its argument on that fact.

displays are not really permanent because both Utah and the UHPA retain the right to remove the display at any time. These distinctions are unpersuasive.

The fact that the UHPA retains ownership over these displays does not materially affect our analysis of whether the displays at issue in this case constitute government speech. In Pleasant Grove City, the Supreme Court noted that the city had taken ownership of "most of the monuments in the Park." 129 S. Ct. at 1134 (emphasis added). However, the Court gave no indication that only those monuments which the city actually owned constituted government speech. To the contrary, the Court strongly implied that all the monuments in that park were government speech, and further indicated that, in the vast majority of cases, a permanent monument on public land will be considered government speech. Id. at 1138. The fact that the Court thought all of the monuments in that park were government speech is perhaps best illustrated by the Court's choice of an example of a permanent monument on public land that would not be government speech: a "monument on which all the residents . . . could place the name of a person to be honored or some other private message." Id. The Court's choice to use a hypothetical example, and not just to point to some of the memorials in the park at issue that might be privately owned in that case indicates that the Court considered all the monuments in that park to be government speech. Thus, the fact that the UHPA, not Utah, owns the memorial crosses does not affect our determination of whether they are government speech.

Similarly, Utah's attempt to distance itself from the message conveyed by these memorial crosses, by stating that it neither "approves or disapproves" them, falls flat in light of the Supreme Court's discussion in Pleasant Grove City. In Pleasant Grove City, the Court explicitly rejected the respondent's argument that, in order for a monument to constitute government speech, the state must formally adopt the message conveyed by the display. The Court noted that the City's decision to display that permanent monument on its property "provided a more dramatic form of adoption than the sort of formal endorsement that respondent would demand . . . ." Id. at 1134. Conversely, the government's actions in this case—allowing these memorial crosses to be displayed with the official UHP insignia primarily on public land—cannot be overshadowed by its attempts to distance itself from the message conveyed by these displays.

Finally, we reject the state amici's contention that, because the UHPA and Utah each retained the right to remove these displays, they are not "permanent" and, therefore, the Court's decision in Pleasant Grove City does not cover this case. This project began more than ten years ago, and there is no evidence that any of the memorial crosses erected since that time have been removed. We think that is permanent enough to constitute government speech. See id. at 1138 (contrasting the "permanent" displays at issue in that case with the "temporary" sixteen-day display at issue in Capitol Square Review and Advisory Board v.

-15-

Pinette, 515 U.S. 753 (1995)).[8]

### D. Federal Establishment Clause claim

#### 1. *Standard of Review*

This court reviews de novo a district court's decision in a First Amendment case, O'Connor, 416 F.3d at 1223; Snyder v. Murray City Corp., 159 F.3d 1227, 1230 n.7 (10th Cir. 1998) (en banc), and undertakes "an independent examination of the whole record." O'Connor, 416 F.3d at 1223; see also Weinbaum, 541 F.3d at 1029 ("We review *de novo* a district court's findings of constitutional fact and its ultimate conclusions regarding a First Amendment challenge.") (internal citations and quotations omitted). "More specifically, in Establishment Clause cases, we consider 'a district court's findings on each part of the Lemon[ v. Kurtzman, 403 U.S. 602 (1971)] test' to be 'constitutional facts'" that we review de novo. Green, 568 F.3d at 795-96 (quoting Robinson v. City of Edmond, 68 F.3d 1226, 1230 n.7 (10th Cir. 1995)). Where, as here, the district court granted summary judgment for Defendants, "we must ensure that 'there is no genuine

---

[8]At oral argument, the state amici also argued that this case is distinguishable from Pleasant Grove City because the memorials in this case were erected in places like the sides of the road, where space is less scarce than in public parks. We also find this distinction unpersuasive. Surely, the memorials placed in front of the UHP office are on land that is no less scarce than the land in most parks. Further, as the record in this case demonstrates, the State tightly controls the displays placed on the rights-of-way near its roads and, although those rights-of-way may cover a larger geographic area than the state's parks (an allegation we are unwilling to accept on the amici's say so), safety concerns and statutes like the federal Highway Beautification Act, 23 U.S.C. § 131, severely limit the area where memorials or other monuments could be displayed.

issue as to any material fact' and that [Defendants are] 'entitled to judgment as a matter of law.'" Weinbaum, 541 F.3d at 1029 (quoting Fed. R. Civ. P. 56(c)). In so doing, this court "view[s] the evidence and draw[s] reasonable inferences therefrom in the light most favorable to the nonmoving party." Grace United Methodist Church v. City of Cheyenne, 451 F.3d 643, 649 (10th Cir. 2006) (quoting Keys Youth Servs., Inc. v. City of Olathe, 248 F.3d 1267, 1270 (10th Cir. 2001)).

2.      *The Lemon/Endorsement Test*

"The first clause of the First Amendment provides, 'Congress shall make no law respecting an establishment of religion . . . .' U.S. Const. amend. I. This substantive limitation applies also to the 'legislative power of the States and their political subdivisions' as a result of the Fourteenth Amendment." Weinbaum, 541 F.3d at 1029 (quoting Santa Fe Indep. Sch. Dist. v. Doe, 530 U.S. 290, 301 (2000)). The Establishment Clause "enshrines the principle that government may not act in ways that 'aid one religion, aid all religions, or prefer one religion over another.'" Id. (quoting Snyder, 159 F.3d at 1230); see also County of Allegheny v. Am. Civil Liberties Union, 492 U.S. 573, 590 (1989) (stating that the Establishment Clause guarantees "religious liberty and equality to 'the infidel, the atheist, or the adherent of a non-Christian faith such as Islam or Judaism'") (quoting Wallace v. Jaffree, 472 U.S. 38, 52 (1985)). This concept is not, however, as simple as it may sound, and courts have struggled mightily to

-17-

articulate when government action has crossed the constitutional line.  See

Bauchman ex. rel. Bauchman v. W. High Sch., 132 F.3d 542, 551 (10th Cir. 1997)

(noting the Supreme Court's failure to "prescribe a general analytic framework

within which to evaluate Establishment Clause claims," and that "many believe

the Court's modern Establishment Clause jurisprudence is in hopeless disarray")

(citation and quotation omitted).

Although the Supreme Court is sharply divided on the standard governing

Establishment Clause cases, see Green, 568 F.3d at 797 n.8 (discussing the

confusion generated by the Supreme Court's decision in Van Orden v. Perry, 545

U.S. 677 (2005)), this court has recently affirmed that "the touchstone for

Establishment Clause analysis remains the tripartite test set out in Lemon."

Green, 568 F.3d at 796 (quoting Weinbaum, 541 F.3d at 1030); see also Gonzales

v. N. Tp. of Lake County, 4 F.3d 1412, 1417-18 (7th Cir. 1993) ("Although the

test is much maligned, the Supreme Court recently reminded us that Lemon is

controlling precedent and should be the framework used by courts when

reviewing Establishment Clause challenges.").

The Court in Lemon established three general tests to determine whether a

state has violated the principles protected by the Establishment Clause: "First, the

statute must have a secular legislative purpose; second, its principal or primary

effect must be one that neither advances nor inhibits religion; finally, the statute

must not foster an excessive government entanglement with religion."  Lemon,

403 U.S. at 612-13 (citations and quotations omitted). If any of these tests are violated, the state practice will be deemed unconstitutional. See Green, 568 F.3d at 797-98 ("A governmental action violates the Establishment Clause if it fails to satisfy *any* of three prongs of the Lemon test.") (emphasis in original). On appeal, Plaintiffs argue that Defendants have violated the first and second Lemon tests.

Addressing the first and second Lemon tests, "[t]his court 'interpret[s] the purpose and effect prongs of Lemon in light of Justice O'Connor's endorsement test.'" Weinbaum, 541 F.3d at 1030 (quoting O'Connor, 416 F.3d at 1224); see also Bauchman, 132 F.3d at 552 ("Justice O'Connor's 'endorsement test' is now widely accepted as the controlling analytical framework for evaluating Establishment Clause claims."). Under that test, "[t]he purpose prong of the Lemon test asks whether government's actual purpose is to endorse or disapprove of religion. The effect prong asks whether, irrespective of government's actual purpose, the practice under review in fact conveys a message of endorsement or disapproval." Lynch v. Donnelly, 465 U.S. 668, 690 (1984) (O'Connor, J., concurring). Justice O'Connor's modification of the Lemon test makes our inquiry very case-specific, as it asks this court to examine carefully the particular context and history of these displays before concluding what effect they would

likely have on the reasonable observer.[9]  See County of Allegheny, 492 U.S. at 605-08 (defending the fact-specific nature of the Court's Establishment Clause jurisprudence which requires that courts "examine[] the particular contexts in which the government employs religious symbols").

3.    *Plaintiffs Have Failed to Establish a Violation of the Purpose Prong of the Lemon Test*

The question presented by the first prong of the Lemon test, then, is "whether the government conduct was motivated by an intent to endorse religion."  Weinbaum, 541 F.3d at 1030.  "In deciding whether the government's purpose was improper, a court must view the conduct through the eyes of an 'objective observer,' one who takes account of the traditional external signs that show up in the text, legislative history, and implementation of the statute, or comparable official act."  Id. at 1031 (quotations omitted).  "We will not lightly attribute unconstitutional motives to the government, particularly where we can discern a plausible secular purpose."  Id.  (quotation, alteration omitted).

Here, we can discern a plausible secular purpose.  Considering first the evidence of the UHPA's motivation, that organization has, throughout the course of this project, consistently asserted that its intent in erecting these memorials is only secular: to honor fallen troopers and to promote safety on the State's highways.  The secular nature of the UHPA motive is bolstered by the fact that

_____

[9]We reject Plaintiffs' argument that any time government conduct involves the use of a Latin cross, there is an Establishment Clause violation.

-20-

the memorials were designed by two individuals who are members of the Mormon faith, the Church of Jesus Christ of Latter Saints ("LDS Church"), a religion that does not use the cross as a religious symbol. These men explained that they were inspired to use the Latin cross for the fallen trooper memorials because of the presence of such crosses in military cemeteries, which honor fallen service members for their sacrifice, and roadside memorials found where traffic fatalities have occurred. Plaintiffs are unable to point to any evidence suggesting that the UHPA's motive is other than secular.

Nevertheless, the focus of this first Lemon test is on the government's purpose, and not that of a private actor. See Green, 568 F.3d at 800 n.10. But in this case the evidence supports our attributing the UHPA's motivation to the State Defendants. In allowing the UHPA to use the UHP insignia on the memorial crosses and in giving UHPA permission to place some of those crosses on public land, state officials accepted the UHPA's assertion of its motives and further acknowledged support for the UHPA's intent. Plaintiffs have failed to present any evidence that, to the contrary, suggested that the State Defendants' motivation was different than that expressed by UHPA.[10]

Furthermore, in light of this evidence, there is no reason to conclude that

_____

[10]Plaintiffs argue that the State Defendants failed to present any evidence of their actual motive in permitting UHPA to use the UHP insignia and to place some of the memorials on public land. But Plaintiffs bear the burden of proving that the State Defendants have violated the Establishment Clause. See Brooks v. City of Oak Ridge, 222 F.3d 259, 265 n.4 (6th Cir. 2000).

-21-

the Defendants' proffered secular explanations were a sham. See Weinbaum, 541 F.3d at 1031 ("Unless the secular justification is a 'sham' or is 'secondary' to a religious purpose, we defer to the government's professed purpose for using the symbol.") (citation omitted). Nor can we say that the secular purpose advanced by Defendants is so implausible that they must have actually been motivated by a religious purpose, even if there is no direct evidence of such a purpose. Cf. Gilfillan v. City of Philadelphia, 637 F.2d 924, 930 (3rd Cir. 1980) (holding that Philadelphia's decision to build a massive stage adorned with a thirty-six-foot cross in preparation for the Pope's visit violated the purpose prong of the Establishment Clause despite the city's claim that its purpose in building this structure was for public relations, not to endorse a religion). Therefore, we uphold the district court's determination that the State Defendants did not violate Lemon's first test by acting with the impermissible motive of endorsing or favoring religion.

4.      *UHPA's Memorial Crosses Violate the Effect Prong of the Lemon/Endorsement Test*

Next, we consider whether the State Defendants violated the second Lemon test. The Establishment Clause "mandate[s] governmental neutrality between religion and religion, and between religion and non-religion." Weinbaum, 541 F.3d at 1029 n.13 (quoting O'Connor, 416 F.3d at 1223). Thus, this court recently observed that

[g]overnments may not "mak[e] adherence to a religion relevant in any way to a person's standing in the political community." County of Allegheny v. Am. Civil Liberties Union Greater Pittsburgh Chapter, 492 U.S. 573, 594 (1989) (quoting Lynch, 465 U.S. at 687 (O'Connor, J., concurring)). And actions which have the effect of communicating governmental endorsement or disapproval, "whether intentionally or unintentionally, . . . make religion relevant, in reality or public perception, to status in the political community." Lynch, 465 U.S. at 692 (O'Connor, J., concurring).

Green, 568 F.3d at 799.

When determining whether a display has the impermissible effect "of communicating a message of governmental endorsement or disapproval" of religion, Green, 568 F.3d at 799, we

look[] through the eyes of an objective observer who is aware of the purpose, context, and history of the symbol. The objective or reasonable observer is kin to the fictitious "reasonably prudent person" of tort law. See Gaylor[v. United States], 74 F.3d [214,] 217 [(10th Cir. 1996)]. So we presume that the court-created "objective observer" is aware of information "not limited to 'the information gleaned simply from viewing the challenged display.'" O'Connor, 416 F.3d at 1228 (quoting Wells v. City & County of Denver, 257 F.3d 1132, 1142-43 (10th Cir. 2001).

Weinbaum, 541 F.3d at 1031 (emphasis added). While the reasonable observer "is presumed to know far more than most actual members of a given community," id. at 1031 n.16, "we do not treat the reasonable observer as omniscient." Green, 568 F.3d at 800 (citing Bauchman, 132 F.3d at 560); see also Buono v. Norton, 371 F.3d 543, 550 (9th Cir. 2004) ("How much information we will impute to a reasonable observer is unclear.").

a. Purpose

-23-

Separate from <u>Lemon</u>'s first test, courts also consider the Government's purpose in undertaking the challenged conduct as illustrative of the effect that that conduct conveys. See <u>Weinbaum</u>, 541 F.3d at 1031, 1033 (noting that "[e]ffects are most often the manifestation of a motivating purpose"). As previously stated, in this case the UHPA's stated purpose in erecting these memorial crosses, and the State Defendants' purpose in allowing the UHPA to incorporate the UHP symbol into the memorials and to place the crosses on public land, was secular. That fact, however, cannot be dispositive of whether the State has violated the effect prong of the <u>Lemon</u>/endorsement test, or this second prong would be rendered meaningless. Rather, the State's secular purpose is merely one element of the larger factual and historical context that we consider in order to determine whether these memorial crosses would have an impermissible effect on the reasonable observer.

b. Context and history[11]

Context can determine the permissibility of displays of religious symbols on public property. See <u>Allegheny County</u>, 492 U.S. at 598 ("Under the Court's holding in *Lynch*, the effect of a crèche display turns on its setting."); <u>Weinbaum</u>, 541 F.3d at 1035 (holding that the city of Las Cruces could use a three-cross symbol as part of its city seal because the context and history of that city

---

[11]Here we deal with context and history together because there is no evidence of relevant historical factors apart from context information.

-24-

"establishe[d] that the symbolism is not religious at all. Rather, it simply reflects the name of the City which, in turn, reflects a series of secular events that occurred near the site of the City."). The significance of context is perhaps best illustrated by the Supreme Court's two recent decisions involving displays of the Ten Commandments on public land. In Van Orden v. Perry, 545 U.S. 677 (2005), Justice Breyer, whose concurrence provided the deciding vote, concluded that the display of the Ten Commandments challenged in that case did not violate the Establishment Clause based largely on his analysis of the "context of the display," id. at 701 (Breyer, J. concurring), and his conclusion that "the context suggests that the State intended the display's moral message . . . to predominate," id. at 702 (Breyer, J., concurring). In contrast, the majority of the Court found the Decalogue display in McCreary County v. American Civil Liberties Union, 545 U.S. 844, 881 (2005), to be in violation of the Establishment Clause because it was placed there with a religious purpose as evidenced, in part, by the fact that it was initially displayed on its own. Thus, the context of a display can determine its legality.

This case involves memorials using a Latin cross, which "is unequivocally a symbol of the Christian faith." Weinbaum, 541 F.3d at 1022. In light of that, there is little doubt that Utah would violate the Establishment Clause if it allowed a private group to place a permanent unadorned twelve-foot cross on public property without any contextual or historical elements that served to secularize

the message conveyed by such a display. See American Civil Liberties Union v. Rabun County Chamber of Commerce, Inc., 698 F.2d 1098, 1100-01 (11th Cir. 1983) (holding that a lighted thirty-five-foot stand-alone cross could not be displayed in a state park); see also County of Allegheny, 492 U.S. at 599 (using the display of a cross in a central location in a government building on Easter as the prototypical example of a display that would convey government "endorsement of Christianity"); Buono, 371 F.3d at 544-45 (holding that an eight-foot cross intended as a war memorial and located on land owned by the national government violated the Establishment Clause); cf. Trunk v. City of San Diego, 568 F. Supp. 2d 1199, 1202 (S.D. Cal. 2008) (holding that a cross that had become a long-standing landmark of the city and was only one part of a larger war memorial could be maintained on federal land). Thus, these displays of "the preeminent symbol of Christianity," Buono, 371 F.3d at 545 (citation and quotation omitted), can only be allowed if their context or history avoid the conveyance of a message of governmental endorsement of religion.

Here, we conclude that the cross memorials would convey to a reasonable observer that the state of Utah is endorsing Christianity. The memorials use the preeminent symbol of Christianity, and they do so standing alone (as opposed to it being part of some sort of display involving other symbols). That cross conspicuously bears the imprimatur of a state entity, the UHP, and is found

primarily on public land.[12]

The fact that the cross includes biographical information about the fallen trooper does not diminish the governmental message endorsing Christianity. This is especially true because a motorist driving by one of the memorial crosses at 55-plus miles per hour may not notice, and certainly would not focus on, the biographical information. The motorist, however, is bound to notice the preeminent symbol of Christianity and the UHP insignia, linking the State to that religious sign.

Moreover, the fact that all of the fallen UHP troopers are memorialized with a Christian symbol conveys the message that there is some connection between the UHP and Christianity. This may lead the reasonable observer to fear that Christians are likely to receive preferential treatment from the UHP—both in their hiring practices and, more generally, in the treatment that people may expect to receive on Utah's highways.[13] The reasonable observer's fear of unequal treatment would likely be compounded by the fact that these memorials carry the

---

[12]The record indicates that at least one, and perhaps several, of these memorials are located on private land near a state highway. That fact does not change our analysis, however, because those crosses, even though on private land, still bear the UHP insignia, which UHPA was authorized by UHP to use.

[13] The connection between the UHP and Christianity is perhaps even more strongly conveyed by the two memorial crosses located immediately outside the UHP office. We are deeply concerned about the message these crosses would convey to a non-Christian walking by the UHP office or, even more troubling, to a non-Christian walking in against his will.

same symbol that appears on UHP patrol vehicles. See Friedman v. Bd. of County Comm'rs of Bernalillo County, 781 F.2d 777, 778, 782 (10th Cir. 1985) (holding that a city's seal "bearing, among other things, a latin cross and the Spanish motto, 'CON ESTA VENCEMOS' ['With This We Conquer']," violated the Establishment Clause in part because "[a] person approached by officers leaving a patrol car emblazoned with this seal could reasonably assume that the officers were Christian police. . . . A follower of any non-Christian religion might well question the officers' ability to provide even-handed treatment. A citizen with no strong religious conviction might conclude that secular benefit could be obtained by becoming a Christian."). And the significant size of the cross would only heighten this concern.

Defendants point to four contextualizing facts that, they argue, render these cross memorials sufficiently secular to pass constitutional muster: (1) these displays are clearly intended as memorials; (2) they are located in areas where similar memorials have long been displayed; (3) many of the designers and producers of these displays do not revere the cross as a symbol of their faith; and (4) a majority of Utahns do not revere the cross as a symbol of their faith. Although we agree that some of these contextual elements may help reduce the message of religious endorsement conveyed by these displays, we think that these displays nonetheless have the impermissible effect of conveying to the reasonable observer that the State prefers or otherwise endorses Christianity.

*i. These Displays are Clearly Intended as Memorials*

Defendants argue that the placement of these displays, in combination with the troopers' names emblazoned on the crosses and the biographical information included in these displays, clearly conveys the message, instead, that these crosses are designed as memorials and, therefore, that they do not convey a message of religious endorsement. We agree that a reasonable observer would recognize these memorial crosses as symbols of death. However, we do not agree that this nullifies their religious sectarian content because a memorial cross is not a generic symbol of death; it is a Christian symbol of death that signifies or memorializes the death of a Christian. The parties agree that a cross was traditionally a Christian symbol of death and, despite Defendants' assertions to the contrary, there is no evidence in the record that the cross has been widely embraced as a marker for the burial sites of non-Christians or as a memorial for a non-Christian's death. The UHPA acknowledges that when it asserts that it would honor the request made by a Jewish state trooper's family to memorialize him with a Star of David rather than a cross.

The State Defendants point to the use of crosses as markers for fallen soldiers as evidence that the cross has become a secular symbol of death. However, the evidence in the record shows that the military provides soldiers and their families with a number of different religious symbols that they may use on government-issued headstones or markers. Even in the American military

cemeteries overseas, which include rows and rows of white crosses, fallen Jewish service members are memorialized instead with a Star of David. Thus, while the cross may be a common symbol used in markers and memorials, there is no evidence that it is widely accepted as a secular symbol.

Defendants and some of the amici urge this court to treat memorial crosses in much the same way as the Supreme Court has treated Christmas trees and historical displays that include depictions of the Ten Commandments. These arguments are unpersuasive. Courts have consistently treated Christmas as both a religious and secular holiday, and many courts have cited Justice Blackmun's statement that "[a]lthough Christmas trees once carried religious connotations, today they typify the secular celebration of Christmas." County of Allegheny, 492 U.S. at 616 (Blackmun, J., concurring); see, e.g., Adland v. Russ, 307 F.3d 471, 485 (6th Cir. 2002); American Civil Liberties Union v. Schundler, 104 F.3d 1435, 1442 (3rd Cir. 1997). Unlike Christmas, which has been widely embraced as a secular holiday, however, there is no evidence in this case that the cross has been widely embraced by non-Christians as a secular symbol of death. We cannot, therefore, conclude that the cross—which has a long history as a predominantly religious symbol—conveys in this context a secular meaning that can be divorced from its religious significance. Compare Weinbaum, 541 F.3d at 1034 (concluding that the city of Las Cruces's use of a three-cross symbol did not violate the Establishment Clause at least in part because "symbols containing

-30-

multiple crosses identify many secular businesses with the Las Cruces community"), with Koenik v. Felton, 190 F.3d 259, 266 n.7 (4th Cir. 1999) (rejecting the argument that Easter, like Christmas, had been embraced as a secular holiday because the "record [wa]s devoid" of evidence that there was a significant "number of persons for whom the holiday has no religious significance but who nonetheless celebrate the occasion in some manner").

Similarly, the memorial crosses at issue here cannot be meaningfully compared to the Ten Commandments display that the Supreme Court upheld in Van Orden. The display at issue in Van Orden was part of a historical presentation of various legal and cultural texts and, in that context, the "nonreligious aspects of the tablets' message [] predominate[d]" over any religious purpose or effect. 545 U.S. at 701 (Breyer, J., concurring). In this case, on the other hand, the crosses stand alone, adorned with the state highway patrol insignia and some information about the trooper who died there.

> ii. Roadside Memorials Often Use the Symbol of the Cross and, in that Context, Crosses are not Seen as Religious Symbols

Defendants argue that crosses are a fairly common symbol used in roadside memorials and, in that context, they are seen as secular symbols. However, the mere fact that the cross is a common symbol used in roadside memorials does not mean it is a secular symbol. There is no evidence that non-Christians have embraced the use of crosses as roadside memorials. Further, there is no evidence

-31-

that any state has allowed memorial crosses to be erected on public property that, like the memorials at issue in this case, display the official insignia of a state entity. Finally, even if we might consider a roadside cross generally to be a secular symbol of death, the memorial crosses at issue in this case appear to be much larger than the crosses typically found on the side of public roads. Defendants provided a statement from a representative of the Montana American Legion White Cross Highway Fatality Marker Program in support of their claim that roadside crosses are common, recognizable symbols of highway fatalities. The cross memorials at issue here are ten times as large as those crosses, which are only between twelve and sixteen inches in height. The massive size of the crosses displayed on Utah's rights-of-way and public property unmistakably conveys a message of endorsement, proselytization, and aggrandizement of religion that is far different from the more humble spirit of small roadside crosses.[14]

> *iii. The Designers and Producers of These Displays do not Revere the Cross as a Symbol of their Faith*

---

[14]In fact, the massive size of these displays is such a deviation from the normal memorials of death seen on the sides of roads that they may convey to the reasonable observer a Christian religious symbol. Defendants assert the crosses must be as large as they are so motorists passing by at 55-plus miles per hour can see them. But the size far exceeds the size necessary to be seen from the highway. And, not all of the memorials are located near a highway. For example, several are located near a UHP office. The size of those crosses is particularly troubling.

Nor are we persuaded of the significance of the fact that many of the designers and producers of these displays do not revere the cross as a symbol of their faith. As the Supreme Court recently explained, "[b]y accepting a privately donated monument and placing it on [state] property, a [state] engages in expressive conduct, but the intended and perceived significance of that conduct may not coincide with the thinking of the monument's donor or creator." Pleasant Grove City, 129 S. Ct. at 1136. Thus, the designers' purpose in creating the displays at issue in this case may not always coincide with the displays' likely effect on the reasonable observer. We conclude that is the case here.

### iv. Christians who Revere the Cross are a Minority in Utah

Similarly, the fact that cross-revering Christians are a minority in Utah does not mean that it is implausible that the State's actions would be interpreted by the reasonable observer as endorsing that religion. In County of Allegheny, the Supreme Court held that Pittsburgh did not violate the Establishment Clause by placing a Channukah menorah on its property. However, in a vote-counting exercise, Justice Blackmun explained, in a portion of the opinion which no other Justice joined, that his conclusion that this "display cannot be interpreted as endorsing Judaism alone does not mean, however, that it is implausible, as a general matter, for a city like Pittsburgh to endorse a minority faith." 492 U.S. at 616 n.64 (Blackmun, J., concurring). Similarly, in her concurrence, Justice

O'Connor noted that

> [r]egardless of the plausibility of a putative governmental purpose, the more important inquiry here is whether the governmental display of a minority faith's religious symbol could ever reasonably be understood to convey a message of endorsement of that faith. A menorah standing alone at city hall may well send such a message to nonadherents, just as in this case the crèche standing alone at the Allegheny County Courthouse sends a message of governmental endorsement of Christianity . . . .

Id. at 634 (O'Connor, J., concurring). Three other Justices found that, in fact, the menorah/Christmas tree display violated the constitution, concluding that the city's display of Christmas and Hanukkah symbols was "the very kind of double establishment that the First Amendment was designed to outlaw." Id. at 655 (Stevens, J., concurring in part and dissenting in part). Thus, a majority of the Justices in County of Allegheny determined that a city could violate the Establishment Clause by publicly displaying the symbol of a religion whose members constituted a mere 12% of that city's population. See id. at 616 n.64 (noting that Jews constituted 45,000 of Pittsburgh's population of 387,000, or approximately 12% of the population) (Blackmun, J., concurring). In this case, the parties agree that cross-revering Christians comprise approximately 18% of the population in Utah, which is greater than the percentage of Jews in Pittsburgh at the time of the Court's decision in County of Allegheny. Thus, the fact that most Utahns do not revere the cross as a symbol of their faith does not mean that the State cannot violate the Establishment Clause by conduct that has the effect of

-34-

promoting the cross and, thereby, the religious groups that revere it.

This appears to be especially true in this case because members of the majority LDS Church "may not necessarily share the same sensitivity to the symbol [of the cross] as a Jewish family."  American Atheists, 528 F. Supp. 2d at 1256 n.6.  Although the evidence indicates that LDS Church members do not use the cross as a symbol of their religion, they do "remember with reverence the suffering of the Savior."  (Aplt. App. at 2241.)  And, in any event, there are many cross-revering Christians and many non-Christians for whom the Roman cross has an unmistakable Christian meaning.

These factors that Defendants point to as secularizing the memorials do not sufficiently diminish the crosses's message of government's endorsement of Christianity that would be conveyed to a reasonable observer.  Therefore, the memorials violate the Establishment Clause.

## IV.  Conclusion

Accordingly, we REVERSE the district court's decision granting summary judgment for Defendants, and REMAND the case to the district court to enter judgment for Plaintiffs consistent with this opinion.







1902